# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1186 | **DATE** | 3/3/2004 |
| **CASE TITLE** | DENNIS DANIELS, et al. vs. FEDERAL RESERVE BANK OF CHGO. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Reserve Bank's Motions for Summary Judgment and Motions to Strike against plaintiffs' Daniels, Brice, Dixon, Carson and Matthews (docs. 208, 212, 214, 233, 243, 266, 267, 269, 270, 273, 274, 282)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant Federal Reserve Bank's Motions for summary judgment [#208, #212, #214, #233, #243] are GRANTED. Judgment is entered in favor of defendant and against Dennis Daniels, Lorraine Matthews, Gerard Brice, Alice Dixon and Charles Carson. Defendant Federal Reserve Bank's motions to strike [#266, #267, #269, #270, #273, #274, #282] are hereby MOOT. Enter Memorandum Opinion and Order. Status hearing to set trial schedule set for 3/17/04 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | **MAR 0 4 2004** date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| JHC | courtroom deputy's initials | date mailed notice |

Document Number

**303**

Date/time received in central Clerk's Office — mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DENNIS DANIELS, et al.,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　)　　No. 98 C 1186
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　Judge William J. Hibbler
FEDERAL RESERVE BANK OF　　　　)
CHICAGO　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　)

**DOCKETED**

MAR 0 4 2004

## MEMORANDUM OPINION AND ORDER

**I.　　Facts Common To All Plaintiffs**

Defendant, Federal Reserve Bank of Chicago ("Bank"), seeks summary judgment on Counts I and IV of the Amended Class Action Complaint ("Complaint") against certain plaintiffs, Dennis Daniels, Lorraine Matthews, Gerard Brice, Alice Dixon, and Charles Carson (collectively, "Plaintiffs"). Counts I and IV comprise Plaintiffs' only surviving claims against the Bank. The Bank has also filed several motions to strike certain exhibits and Rule 56.1 responses. Plaintiffs, together with seven other former employees of the Bank, were certified as a class on March 28 and May 30, 2000, but the Court decertified the class on May 2, 2002, and returned the case to the status of individual claims. Counts III and VI of the Complaint are class action claims that are no longer viable since the class was decertified. Counts II and V by their terms applied only to Cedell Johnson, who is no longer a party to the case. In addition, Counts VII and VIII by their terms only apply to plaintiff Eleanor Baylie, who is not implicated in the Bank's current summary judgment motions.

Count I of the Complaint alleges that:

303

Federal Reserve intentionally subjected Plaintiffs to unequal and discriminatory treatment because of their race and color by: (a) Repeatedly denying them promotions and instead selecting less qualified white employees for those positions; (b) Steering Plaintiffs to low-level, dead-end positions while steering white employees to career path positions with opportunities for advancement; (c) Falsely representing that such low-level positions have growth potential; (d) Excluding Plaintiffs from officer, management, and supervisory level positions; (e) Denying Plaintiffs increases in Grade Level to reflect their performance and responsibilities; (f) Assigning higher grade levels to white employees who have the same or similar or lower level responsibilities as Plaintiffs; (g) Denying Plaintiffs training and mentoring opportunities; (h) Subjecting Plaintiffs to a higher level of scrutiny and to stricter standards than white employees; and (i) Paying Plaintiffs less than similarly situated and less qualified white employees.

Plaintiffs, who are each African-American, claim that these alleged actions by the Bank constitute racial discrimination in employment in violation of 42 U.S.C. §1981. Count IV of the Complaint states that: "Federal Reserve intentionally subjected Plaintiffs D. Daniels, Baylie, Brice, Carson, Dixon, Johnson and Matthews to unequal and discriminatory treatment because of their race and color. Federal Reserve's employment practices have a disproportionate, adverse impact on plaintiffs and other African-Americans." Plaintiffs claim that these actions constitute race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*.

On February 17, 1998, Plaintiffs filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On February 25, 1998, Plaintiffs filed a complaint alleging that the Bank had discriminated against them on the basis of their race, African-American, in violation of 42 U.S.C. § 1981. Plaintiffs filed an amended complaint on June 18, 1998, adding additional plaintiffs and Count IV, the Title VII race discrimination claim. The legal issues in this case are substantially overlapping, so the Court will address each of the pending summary judgment motions in the same opinion.

## II.    Facts Specific To Certain Plaintiffs

### A.    Dennis Daniels

Dennis Daniels was hired by the Bank on March 12, 1973, for the position of Interview and Personnel Assistant, grade ten, in the Human Resources Department. In March 1974, Daniels was promoted to Professional College Recruiter, Junior, grade eleven, and a year later, Daniels was promoted to Coordinator of Professional College Recruiting, grade twelve. In October 1977, Daniels was transferred laterally to the position of Internal Staff Coordinator, and in 1978, he was promoted to Senior Job Analyst, grade thirteen. In May 1982, the Bank's numbered grading system changed, and Daniels became an Administrator A, grade sixty. Three years later, Daniels was promoted to Compensation & Benefits Manager, grade sixty-one. In November 1986, Daniels was laterally transferred to the Office of the Secretariat as a grade sixty-one Manager. On January 20, 1995, the Bank's numbered grading system changed again, and Daniels' job grade was converted to grade fourteen. In October 1995, the Office of the Secretariat was reorganized and broken up into two different units: Communications and Information Services and Office of the Secretary. Daniels became Manager of Communications and Information Services and retained his fourteen job grade.

In July 1996, the Communications and Information Services unit was dissolved, and Daniels' position was eliminated. Daniels was consequently transferred to the newly created position of Electronic Communications Team Leader. Daniels retained the same job grade, salary, and benefits that he had before his transfer. In this position, Daniels was given primary responsibility for the strategic marketing direction of the Bank's new external Web site and internal Intranet (which involved internal electronic communications to employees). Daniels remained in this position for over fifteen months before resigning in September 1997.

3

## B.     Lorraine Matthews

Lorraine Matthews was hired by the Bank on June 9, 1969, as a Difference Clerk, grade four, in the Check Adjustment Department. Six months after joining the Bank, Matthews was promoted to Difference Clerk, grade five, and in June 1970, she was promoted to Difference Clerk, grade six. After the Bank's numbered grading system changed, Matthews became an Inquiry Specialist B, grade thirty-nine. In October 1982, Matthews was promoted to Inquiry Specialist A, grade forty-one. In January 1995, after the grade numbering system changed again, Matthews became a Researcher B, grade seven. Matthews remained in this position until she was terminated in 1997.

On February 20, 1997, Matthews was counseled by her supervisor, Lily Chin, regarding unplanned absences, and she was issued a written Unplanned Absence Disciplinary Action Notice, indicating that Matthews was being placed on counseling status for ninety days. Chin rated Matthews' monthly performance as "did not meet expectations" in February 1997. On March 18, 1997, Matthews was counseled by supervisor Cassandra Ramsey regarding unplanned absences and was issued another written Unplanned Absence Disciplinary Action Notice, this time indicating Matthews was being placed on warning status for ninety days. Once again, in March 1997, Chin rated Matthews as "did not meet expectations." On April 3, 1997, Matthews received a formal notice that she was not meeting her department's expectations on productivity, and she was placed on warning status for three months. At the end of the three months, Matthews was rated in her performance review by supervisor Sylvia Prickel as "did not meet expectations." In June 1997, Matthews' performance efficiency rating was 32%, while the expected performance of employees

in Matthews' department was 60%.[1]  On November 17, 1997, Matthews was called into a meeting with supervisors Kathy Williams, Kathy Balice, and Cassandra Ramsey to discuss her performance. After a confrontation between Matthews and her supervisors in the meeting, Matthews was fired.

### C.  Alice Dixon

Alice Dixon was hired by the Bank in 1969 as a unit inscriber trainee, grade three, in the Check Department.  Six months later, Dixon was promoted to unit inscriber, grade four, and two years later, she was promoted to block preparation clerk, grade five.  In the 1980's, Dixon was promoted to sorter reader operator, grade six, and after about five years, she was promoted to reconciler and correspondent clerk, grade seven.  After the Bank changed its numerical job grading scheme, Dixon's position was reclassified as grade thirty-nine, although her job title and duties remained the same.  In 1989, Dixon's position was retitled reconcilement clerk A, grade thirty-nine, at which she remained until the Bank switched grading systems again in 1995, and Dixon became a grade five.  In 1996, Dixon received a new title, processor B.

Dixon received her Bachelor of Science degree in Management from DePaul University in June 1996.  In October 1996, Dixon applied for a Customer Service Consultant ("CSC") position, which ranges from grades nine to eleven, but she was not selected for any of the open positions.  In November 1996, Dixon was promoted to processor A, grade six.  On January 6, 1997; April 10, 1997; and January 9, 1998; Dixon applied for a CSC position for a second, third, and fourth time, but she was not selected.  Dixon also applied for several other positions for which she was not selected: (1) examiner trainee, October 1997; (2) assistant control specialist, December 23, 1997;

---

[1]Matthews' purported "denials" of these facts do not deny these facts at all.  Rather, Matthews admits that she received these poor performance reviews and counselings, but she challenges the motivation behind them.

(3) analyst in the Check Administration Department, January 26, 1999; and (4) Special Operations Consulting Team, May 14, 1999. Dixon retired in July 2000, as a Processor A, grade six, in the Check Department.

### D.    Gerard Brice

Gerard Brice was hired by the Bank in April of 1995 as a full-time Processor, grade seven, in the Customer Inquiry Unit of the Accounting Services Department. A year later, in April of 1996, Brice was promoted to the position of Accountant C, grade nine in the Accounting Documentation Unit. Between August and September 1997, Brice applied for, and was interviewed for, one of four posted Auditor positions, grade ten, available in the Audit Department. Brice was ultimately denied the position. In October of 1997, Brice was promoted to the position of Accountant B, grade nine in the General Ledger Unit of the Accounting Services Department. After his second promotion, Brice received a salary increase. Between August and September 1998, Brice applied for and received a promotion to Senior Analyst C, grade eleven, in the statistical and finance reporting area of the Bank's Research Department. Brice received a salary increase of over $4,000.

At present, Brice works at the Bank as a Statistical Senior Analyst B, grade twelve, a position to which he was promoted in approximately February of 2003. His primary responsibilities include reviewing and analyzing bank holding companies' regulatory financial statement reports, identifying issues that arise in the reports, and then resolving such issues by communicating with various management personnel at the relevant bank.

### E.    Charles Carson

Charles Carson was hired by the Bank on February 12, 1990, as a Console Operator. In 1994, Carson was working as a Technical Specialist C at grade fifty-seven. In 1994 and 1995, Carson

twice asked to be promoted to grade fifty-eight, but the Bank did not promote him. In December 1995, the Bank revised its grading system, and Carson's title became Operations Technician A at grade level ten. Carson did not experience a pay reduction concurrent with the change in his title and grade. On August 25, 1997, Carson was promoted to grade eleven. In 2000, Carson applied for a grade fourteen or fifteen Server Group position. At the time, Carson was at a grade twelve position. The Server Group position was filled by Debbie Deema, who prior to filling the position was a grade thirteen supervisor.

On August 27, 2001, Carson requested a Bank cellular phone and agreed (in writing) to use the phone for Bank business and to limit personal calls to emergencies. In the months of March, April and May 2002, Carson incurred phone bills for personal calls on the cellular phone of $3,174; $1,830; and $2,115; respectively. The Bank suspended Carson for three weeks in July 2002. On September 5, 2002, the Bank sent Carson a memorandum requesting that Carson review his phone records and reimburse the Bank for all non-emergency personal calls beyond $100. Carson was told to pay for these calls or make other arrangements with the Bank for the payment by October 15, 2002. On October 21, 2002, the Bank again sent Carson a memorandum asking him to pay for the phone calls by October 28, 2002. After Carson failed to respond to a third extension of the deadline to November 15, 2002, the Bank informed Carson on November 19, 2002, that he was being terminated for violation of Bank's Code of Conduct by failing to respond to the requests for the phone bill repayment.

## III.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir. 1998). A question of material fact is a question which will be outcome determinative of an issue in the case. *Anderson*, 477 U.S. at 248.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Id.* A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The non-moving party cannot create an issue of fact with speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). A court is "not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." *Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir. 1995). During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).

## IV.    Untimely Allegations Of Discrimination

Each Plaintiff, except Brice, alleges certain acts of discrimination that occurred outside the time period of the relevant statutes of limitations. Discrete discriminatory acts that occurred outside

8

the relevant time period, however, are time-barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). These alleged untimely discriminatory acts may only be considered for background purposes. *Id.*

## A.    Title VII

Title VII sets forth the relevant time for filing charges as follows:

> . . . in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred. . . .

42 U.S.C.A. § 2000e-5(e)(1).  A claim is time-barred if it is not filed within these time limits. *Morgan*, 536 U.S. at 109.  "According to statute, a plaintiff in a deferral state such as Illinois must file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the alleged unlawful employment practice.  The 300-day limit . . . begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured, see, not when [the plaintiff] determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (internal citations omitted).  Discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period. *Morgan*, 536 U.S. at 112.  The Supreme Court held that:

> First, discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.

*Id.* at 113. Discrete discriminatory acts include acts such as termination, failure to promote, denial of transfer, or refusal to hire. *Id.* at 114. Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.*

In this case, Plaintiffs filed their EEOC charges on February 17, 1998. Therefore, discrete discriminatory acts that allegedly occurred before April 24, 1997, 300 days before the charges were filed, are not actionable under Title VII. Plaintiffs may, however, use alleged prior acts as background evidence in support of their timely claims.

**B.      Section 1981**

Likewise, any alleged adverse action that occurred more than two years before Plaintiffs' complaint was filed is time-barred under § 1981. The Seventh Circuit has held that to bring a claim under § 1981, a plaintiff must file a complaint within two years after the alleged discriminatory conduct occurred. *Walker v. Abbott Lab.s*, 340 F.3d 471, 474 (7th Cir. 2003). *See also Jones v. R.R. Donnelley & Sons Co.*, 305 F.3d 717, 728 (7th Cir. 2002), *cert. granted*, __ U.S. __, 123 S. Ct. 2074 (2003). In determining the statute of limitations for § 1981 claims, the court held that the most analogous statute of limitations was the two-year personal injury statute of Illinois, the forum state, rather than 28 U.S.C.A. § 1658, the four-year statute of limitations for federal civil actions arising under acts of Congress enacted after December 1, 1990. *Jones*, 305 F.3d at 728. Therefore, Plaintiffs are barred from raising claims of discrimination under § 1981 for alleged discriminatory acts occurring before February 25, 1996, two years before Plaintiffs filed their first complaint.

**C.      Continuing violation**

Dixon argues that alleged acts of discrimination occurring before April 24, 1997 (the cut-off date for Title VII claims), and before February 25, 1996 (the cut-off date for § 1981 claims), are not

time-barred because they are part of a "continuing violation" by the Bank. A continuing violation is one whose discriminatory character did not become clear until it was repeated during the limitations period. Dixon claims that a continuing violation is demonstrated by each of Plaintiffs' allegations that the Bank had a long-held "pattern and practice" of racial discrimination against African-Americans and that the Bank's alleged discriminatory acts were similar, repetitive, and continuous. Dixon's argument, however, is misplaced. First, when a plaintiff files an individual claim, rather than a class action, the plaintiff's "evidence of a pattern and practice can only be collateral to evidence of specific discrimination against the actual plaintiff." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) (internal citations omitted).

Second, the continuing violation doctrine does not apply to discrete acts of discrimination that can be pinpointed to a particular day. *Thompson v. White*, No. 02-3891, 2003 WL 21212681, at *2 (7th Cir. 2003) (citing *Morgan*, 536 U.S. 101). Plaintiffs' allegations of discriminatory acts that occurred before the relevant time periods consist only of discrete acts under *Morgan*. Plaintiffs point to specific dates when they felt discriminated against, including primarily failure to promote claims. *See Morgan*, 536 U.S. at 114 (discrete discriminatory acts include failure to promote).

In *Tinner v. United Ins. Co. of Am.*, however, decided before *Thompson* but four months after *Morgan*, the Seventh Circuit held that a continuing violation could be proven where discrete acts of discrimination are part of an ongoing pattern and at least one of the discrete acts occurred within the relevant limitations period.[2] 308 F.3d 697, 707 (7th Cir. 2002). Contrary to Dixon's and the other Plaintiffs' evidence, however, this ongoing pattern must be shown through their individual claims

---

[2]*Tinner* also stated two other instances when a continuing violation claim could survive, neither of which applies here: when an employee cannot determine the date of discrimination and when an employer has an express discriminatory policy. *Tinner*, 308 F.3d at 707.

of discrimination, not through other employees' claims and not through a general pattern or practice. *Gilty*, 919 F.2d at 1252. To justify treating separate violations as an ongoing pattern, each individual plaintiff must show that it would have been unreasonable to expect them to sue separately on each alleged violation before the statute ran on the conduct. *Tinner*, 308 F.3d at 707-08. "[I]f the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period." *Id.* at 708.

In making this determination, the court considers: (1) whether the alleged acts against the plaintiff involve the same subject matter; (2) the frequency with which the acts occur; and (3) the degree of permanence of the alleged acts of discrimination that should trigger an employee's awareness and duty to assert his rights. *Id.* In *Tinner*, the Seventh Circuit held that each incident – including a job transfer, an admonishment by a manager regarding the way Tinner treated a fellow employee, and a dress code violation – represented a discrete act that became actionable when they occurred because Tinner felt discriminated against after each incident. *Id.* at 709. In addition, the incidents were not frequent enough to show a pattern because there was a six-year, three- year and two-year gap between each discrete act. *Id.* Moreover, the court held that the degree of permanence surrounding Tinner's route transfer should have made Tinner aware of the need to protect his rights. *Id.* Therefore, the court found that the employer's alleged discriminatory acts did not constitute a continuing violation. *Id.*

Similarly, in *Selan v. Kiley*, the Seventh Circuit held that the alleged discriminatory acts – including a transfer and a demotion – were too permanent to constitute a continuing violation, in that they separately and permanently removed managerial duties from the plaintiff. 969 F.2d 560, 567

(7th Cir. 1992). Because of their permanent nature, each discrete act should have triggered the plaintiff's awareness of the need to assert or else waive her rights. *Id.* Furthermore, a two-year gap between allegedly discriminatory acts could not support a continuing violation claim. *Id.*

As in *Tinner* and *Selan*, the discriminatory acts alleged by Plaintiffs that occurred before the relevant statutory period were too discrete, too permanent, and too far apart in time to support the contention that the acts were continuous. Dixon, for example, alleges that she was denied promotions for discriminatory reasons in November 1992, October 1994, and January 1995. The first two denials of promotions occurred two years apart, and are too far apart in time to constitute a continuing violation. In addition, each of the alleged incidents were too permanent and distinct in nature to constitute a continuing violation, as Dixon testified that at the time she was denied the promotions she believed she was more qualified than the successful candidates for the position and thus discriminated against. Each Plaintiff similarly alleged untimely failure to promote or disparate pay claims that they felt were discriminatory at the time the acts occurred. Therefore, Dixon and the other Plaintiffs were not reasonable in waiting until 1998 to file their charges alleging racial discrimination for time-barred acts.

## V.    Section 1981 And At-Will Employees

For certain Plaintiffs (Brice, Matthews, and Dixon), the Bank claims that it is entitled to summary judgment on their § 1981 claims because they were at-will employees. The parties do not dispute that Plaintiffs were at-will employees and that, therefore, either party to the employment relationship could terminate the relationship at any time. The Bank argues that as at-will employees, Plaintiffs had no contractual relationship with the Bank and thus could not bring a claim under § 1981. While it is true that proof of a contractual relationship is necessary to establish a § 1981

claim, at-will employment relationships are sufficiently contractual in nature to maintain a § 1981 action for discrimination, at least with regard to issues of promotion and pay. *Walker*, 340 F.3d at 475, 478. At-will employees are capable of losing or quitting their employment at any time, but they still maintain the enforceable contractual rights of wages, benefits, duties, and working conditions. *Id.* at 476. Therefore, although at-will employees may not be able to raise § 1981 claims with respect to termination or lay-off, they may maintain § 1981 claims for issues of wages, benefits (including promotions), duties, and working conditions. This Court need not reach the issue whether at-will employees may raise § 1981 claims with respect to termination because each Plaintiff has failed to state a *prima facie* case of discrimination.[3]

## VI. *Prima Facie* Case Of Discrimination

The Bank claims that summary judgment is also proper against each of the Plaintiffs on their timely allegations of discrimination because they fail to establish a *prima facie* case of discrimination under both Title VII and § 1981. Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, . . . or to segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect

---

[3]Section 4 of the Federal Reserve Act, 12 U.S.C.A. § 341, does not alter this analysis. As with any at-will employment situation, the Federal Reserve Act gives the Federal Reserve Bank the power to make contracts and to dismiss at its pleasure its officers or employees. As explained above, this power to make contracts does not change the fact that the employees may still bring certain § 1981 claims. 12 U.S.C.A. § 341.

his status as an employee because of such individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1-2).

When a plaintiff alleges intentional discrimination, as in this case, Title VII and § 1981 actions have the same liability standards, and they are analyzed in the same manner. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998); *Friedel v. City of Madison*, 832 F.2d 965, 971-72 (7th Cir. 1987). A plaintiff alleging race discrimination must prove his or her claims using direct or indirect evidence. "[D]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003). A plaintiff can also prevail under the direct method by presenting circumstantial evidence that points directly to a discriminatory reason for the employer's action. *Id.* Plaintiffs have not alleged direct evidence of discrimination. Therefore, they must prove their claims under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), indirect burden-shifting method of proof.

Under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination. A *prima facie* case of discrimination requires a showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job or was meeting the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the employer treated similarly situated employees outside of the protected class more favorably. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999). The Bank does not dispute that Plaintiffs are members of a protected class – African-American – so the Court will address the remaining three elements of the *prima facie* case.

## A. Dennis Daniels

### 1. Did Daniels suffer an adverse employment action?

Daniels alleges that he suffered three adverse employment actions by the Bank on account of his race: demotion, failure to promote, and constructive discharge. The Bank argues that none of these constitute adverse employment actions.

#### a. Demotion

The Seventh Circuit defines an adverse employment action as:

> . . . more disruptive than a mere inconvenience or an alteration of job responsibilities. A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Of course, not everything that makes an employee unhappy will suffice to meet the adverse action requirement. Rather, an employee must show that material harm has resulted from the challenged actions.

*Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2002) (internal citations omitted). *See also Crady v. Liberty Nat. Bank and Trust Co. of Indiana*, 993 F.2d 132, 135-36 (7th Cir. 1993).

Daniels alleges that he was demoted when the Bank transferred him from a manager in the Communications and Information Services unit to Electronic Communications Team Leader. The Bank disputes that this transfer was a "demotion," and claims that Daniels' job change was merely a "lateral transfer." Daniels was transferred to the newly created position of Electronic Communications Team Leader when the Communications and Information Services unit was dissolved in July 1996. Daniels retained the same job grade, salary, and benefits he had before his transfer. Daniels' new responsibilities included coordinating activities related to the strategic

16

marketing direction of the Bank's newly developed Web site and internal Intranet, and small projects such as floor arrangements and office moves. He supervised two people in his new position.

In his affidavit and in a questionnaire he filled out himself, Daniels stated that his duties in his former position included: coordinating preparation of conference and committee briefings for the President and First Vice President on critical system issues; preparing and monitoring departmental goals, objectives, and budget; monitoring and coordinating contingency planning and data security for the Secretariat and Legal Departments; and assisting the officer in charge in providing general research to the President, First Vice President, and senior officer. Daniels supervised between two to five employees at various times in that position. Based on these differences in job responsibilities between the two positions, Daniels claims that he meets the test for a materially adverse employment action. The Court disagrees.

Under *Traylor*, Daniels must show that he faced "significantly diminished material responsibilities" in his new position. *Traylor*, 295 F.3d at 788-89. Although Daniels' responsibilities changed with his transfer, Daniels has not shown that his responsibilities were "significantly diminished." In *Crady*, the Seventh Circuit held that the plaintiff's transfer from a branch manager position to a collections officer position did not constitute a materially adverse employment action. *Crady*, 993 F.2d at 135-36. Although the plaintiff's responsibilities had changed, he did not show that they were less significant than the responsibilities he previously enjoyed. *Id.* In addition, although the latter position did not carry with it an assistant vice president designation, the plaintiff would have maintained a management-level position at the same salary and benefits he was already receiving. *Id.* Therefore, the court held against the plaintiff.

As in *Crady*, Daniels maintained the same salary and benefits in his new job. He continued to supervise other employees, and he was in charge of marketing for the Bank's Web site and Intranet. Daniels' disappointment that he no longer interfaced with the board and senior management does not demonstrate that his responsibilities were "significantly diminished." In addition, Daniels provides insufficient evidence for his claim that he was less busy in his new position or that it was a "dead end" position with no opportunity for advancement. Daniels cites only his own subjective impression that the board lacked interest in the Website and Intranet. A plaintiff's speculation, however, is not a sufficient defense to summary judgment. *Karazanos v. Navistar Int'l Trans. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991). Daniels only has evidence that his responsibilities were different, not substantially diminished, and thus, a reasonable jury could not find that Daniels' transfer to Electronic Communications Team Leader was a demotion.

### b. Constructive discharge

Daniels also claims that the Bank constructively discharged him on account of his race on September 25, 1997, when he resigned from his position at the Bank. A claim of constructive discharge requires a showing that: (1) the plaintiff was constructively discharged; and (2) the plaintiff was constructively discharged on account of a protected characteristic. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000). To prove constructive discharge, a plaintiff must show that his working conditions "were so intolerable that a reasonable person would have been compelled to resign." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998). In addition, "[t]he working conditions must be more than merely intolerable; they must be intolerable in a discriminatory way." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). Working conditions that intolerable require an "aggravating situation" beyond "ordinary" discrimination, as an employee

18

is otherwise expected to seek legal redress while remaining in his job. *Sears*, 233 F.3d at 440-41; *Drake*, 134 F.3d at 886; *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

It is undisputed that the catalyst for Daniels' resignation was the Bank's transfer of him in July 1996 to the position of Electronic Communication Team Leader. Daniels, however, claims that his resignation amounts to a constructive discharge because his transfer to the new position and the Bank's alleged pattern and practice of discrimination made working conditions so intolerable that a reasonable person would have been compelled to resign. Daniels' argument is without merit. First, Daniels remained in the position of Electronics Communications Team Leader for over 15 months before resigning on September 26, 1997. The length of time a plaintiff remains in the job may indicate that the working conditions were not so intolerable as to cause the employee to leave his job. *See Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001) (seven month wait before plaintiff availed herself of the formal procedures for victims of harassment indicated work conditions were not intolerable); *Rabinovitz*, 89 F.3d at 489 (plaintiff enduring workplace restrictions for year and a half not constructively discharged); *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th Cir. 2001) (where employee did not resign until four months after alleged sexually harassing incidents occurred, employee could not claim that those incidents were the triggering events that made it impossible for her to remain at the store); *Sweeney v. West*, 149 F.3d 550, 558 (7th Cir. 1998) (where employee did not resign until almost two full years after the last reported instance of mistreatment, employee was not compelled to resign).

Daniels responds that he had to wait fifteen months before quitting because he initially did not know what the newly created position of Electronic Communications Team Leader entailed, since it did not have a "real job description." Daniels likens his case to *Ulichny v. Merton Cmty. Sch.*

*Dist.*, where the Seventh Circuit held that the employee principal, who left her position three weeks after she was given fewer responsibilities, had not endured the changes for long enough to determine whether work conditions were so intolerable that she could be considered constructively discharged. 249 F.3d 686, 701 (7th Cir. 2001). Daniels' fifteen-month delay, however, is much closer to the time frames at issue in *Rabinovitz, Gawley, Mosher*, and *Sweeney*, where the Seventh Circuit found the employees' delays of four months to two years were too long to constitute constructive discharge.

Second, Daniels' claim that work conditions were intolerable because the Bank allegedly discriminated against African-Americans in general – by depriving African-Americans of opportunities for promotion and increased educational training – does not help his case. As the Court has already stated, when a plaintiff files an individual claim, rather than a class action, the plaintiff's "evidence of a pattern and practice can only be collateral to evidence of specific discrimination against the actual plaintiff." *Gilty*, 919 F.2d at 1252. The class in this case was decertified in May 2002, and therefore only the individual plaintiffs' claims remain. Moreover, Daniels has provided no concrete evidence of this alleged pattern or practice that could even suffice to use as collateral, background evidence. The President of the Bank, Michael Moskow, testified without contradiction that 16% of the Bank's officers and managers were African-American, and Daniels provided no evidence to support his claims that the Bank manipulated the grading system or subjected African-Americans to a higher level of scrutiny.[4]

The two other actions alleged by Daniels also did not cause intolerable working conditions. Daniels cites two instances in September 1997 where Assistant Vice President Robert Lapinski

---

[4]Moreover, Daniels alleges that a pattern or practice of discrimination existed for over twenty years, clearly too long to constitute intolerable working conditions. *See, e.g., Gawley*, 276 F.3d at 315.

voiced his disapproval of Daniels: regarding an idea Daniels had and Daniels' floor arrangement of the office. These acts, even if unwarranted, do not, by themselves, rise to the level of intolerable conditions for a reasonable employee. *See, e.g., Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) ("lack of supervisor support" and reprimands from employer for no reason not intolerable); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (finding that negative performance evaluations alone fail to satisfy the third prong of *McDonnell Douglas* test). Therefore, Daniels has not offered sufficient evidence to create a triable issue of fact with respect to his claim of constructive discharge.

### c. Failure to promote

Daniels also claims that the Bank denied him two promotions because of his race: an administrative officer, strategic marketing position in 1997; and an assistant vice president, administrative services position in 1996. These positions were filled by white employees. The positions were not posted, and Daniels was thus unable to apply for them. In order to establish a material adverse action in the failure-to-promote context, the plaintiff must show that he was rejected for that position. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003); *Gorence v. Eagle Food Centers*, 242 F.3d 759, 765 (7th Cir. 2001); *Johnson*, 260 F.3d at 732 (7th Cir. 2001).[5]

---

[5]Some cases suggest that the plaintiff must show that he applied for the position from which he was rejected. *See Gaines v. White River Envtl. P'ship*, No. 02-3849, 2003 WL 1827209, at *2 (7th Cir. Mar. 27, 2003) (upholding a grant of summary judgment when the plaintiff could not establish a *prima facie* case since the employee never applied for the promotion). The Court need not reach this issue as Daniels has failed to show he was rejected for the positions.

Daniels, however, admits that he was not even considered for these officer positions, and, as explained below, he provides insufficient evidence that he was qualified for these positions.

Daniels' only evidence is that between 1995 to 1997, he allegedly told Jim Holland and Kristi Zimmerman, Assistant Vice Presidents in the Communications and Information Services department, that he wanted to be considered for promotion to the officer level. In 1995, before the relevant statutory time periods, Daniels also allegedly made his desires known to Assistant Vice President and Secretary, Joan DeRycke, and the General Counsel, William Graham, and Graham agreed to recommend Daniels' promotion to the Bank President. Daniels, however, does not allege that these employees had the authority to promote him or to influence the President's decision to promote him, or that they even discussed the two positions at issue – administrative officer and assistant vice president. Therefore, Daniels has not shown that he was considered and rejected for these positions, and Daniels has failed to make out a *prima facie* case of discrimination.

### 2. Was Daniels qualified for the job or meeting the Bank's legitimate expectations?

Even if Daniels could show that he was denied a promotion, he has not shown that he was qualified for the jobs to which he sought promotion. Daniels did not identify the job requirements for either of the officer positions at issue, so Daniels cannot show that he met the requirements. "The comparisons are meaningless absent some information concerning the hiring criteria for these positions." *Bennett v. Roberts*, 295 F.3d 687, 696 (7th Cir. 2002). In addition, Daniels argues that the Bank promoted less qualified white employees to the jobs he sought, but he does not state those employees' qualifications. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of [other] employees, the plaintiff must show that the 'comparables' are

similarly situated in all respects." *Spath v. Hayes Wheels, Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). Daniels' remaining arguments that he met or exceeded his supervisors' expectations consist primarily of his own self-serving testimony.

Daniels' subjective self-appraisal, however, cannot by itself create a genuine issue of fact. *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001). Besides his own affidavit, Daniels presents a June 1996 letter from Kristi Zimmerman, stating that "we can rely on Dennis' many years of experience to give either group a hand when needed." This letter, however, does not relate to the promotions Daniels sought, and so it does not show that Daniels was qualified for those two positions. In addition, the Bank's President and its former Chief Operating Officer testified in deposition that while Daniels worked in the Communications and Information Services unit in the Office of the Secretariat, they found Daniels' executive summaries unhelpful, his performance weak, and a report inadequate. In *Dunn*, the Seventh Circuit held that the plaintiff did not prove he was qualified for a manager position by showing that: the employer had recognized his capability to fulfill the manager position "soon"; he received "excellent ratings" from his superiors while the promoted employee did not; he received two performance awards from his employers; and he had already proven his abilities as assistant manager and acting manager in another store. *Dunn*, 260 F.3d at 787. Daniels presents much less evidence of his qualifications than was presented in *Dunn*, and thus Daniels has not shown that he met or exceeded his supervisors' expectations.

### 3. Did the Bank treat similarly situated employees outside of the protected class more favorably?

The Court need not reach this prong of the *prima facie* case for Daniels because Daniels failed to prove that the Bank committed a material adverse employment action or that he was

qualified for the positions he sought. Regardless, Daniels does not show that similarly situated employees outside of the protected class were treated more favorably than he was. Daniels does not provide evidence of what happened to other employees from the dissolved Communications and Information Services unit, and he does not provide evidence that the employees actually promoted to the two officer jobs he sought were similarly situated to him.

### B. Lorraine Matthews

#### 1. Did Matthews suffer an adverse employment action?

Matthews claims that she suffered five adverse employment actions on account of her race: denial of training, failure to promote, failure to receive an award, disparate pay, and termination of employment.

##### a. Denial of training

First, Matthews claims that in 1995 or 1996, she requested to be trained for the computer room because there was going to be a job opening there. A position in the computer room opened up when an African-American employee was removed, and Matthews asked her supervisor, Kathy Balice, if she could be trained to learn the computer room, but Balice responded that they did not need any more people for the computer room at that time. The Bank denied Matthews' request for training, and weeks later, Sokol was transferred to the computer room.

"A discriminatory denial of job-related training can constitute an adverse employment action under Title VII." *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)). *But see Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 688 (7th Cir. 2003) (inadequate training does not, by itself, amount to the kind of adverse employment action that constitutes discrimination or retaliation).

Although Matthews may not have received training she desired, she does not allege that anyone else received that training either. Therefore, as explained further below, Matthews does not demonstrate a *prima facie* case of failure to promote because she does not show that the Bank trained similarly situated employees not in the protected class. *See Durkin*, 341 F.3d at 612.

### b.    Failure to promote

Matthews next claims that weeks after she requested training, the Bank chose a Caucasian employee for the opening in the computer room, instead of Matthews, on account of Matthews' race. As explained above, in order to establish a material adverse action in a failure-to-promote context, the plaintiff must show that she was rejected for that position. *Grayson*, 317 F.3d at 748. As with Daniels, however, Matthews does not allege that the Bank even considered her, much less rejected her, for the computer room position. The Bank instead chose Josephine Sokol, whom Matthews admits had more knowledge about computers than she did at the time Sokol was transferred to the computer room.

### c.    Failure to receive an award

Matthews also alleges that she was discriminated against on the basis of race when she did not receive an award from the Bank. Over two weekends in October and November of 1996, she and several other employees from her department worked overtime on a special project. Matthews did not receive a special recognition award from the Bank for work on this project, but Matthews believes that most of the other employees working on the project did receive awards. Matthews' failure to receive this award does not constitute an adverse employment action. "[T]he denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a

component of the employee's salary." *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001). *See also Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000) (holding that denial of a bonus was not an adverse employment action). In Matthews' case, the award was even less significant, as it did not involve money or any other type of substantive employment gain. Furthermore, Matthews does not know the names or races of those who did or did not get awards, and thus does not show similarly situated employees were treated differently than she. Therefore, her failure to receive the award does not constitute an adverse employment action.

### d.    Disparate pay

Matthews claims that the Bank also discriminated against her by paying her less than two non-African-American employees, Jeannette Mihalic and Gail Freer. The Bank admits that Matthews was paid less than Mihalic and Freer, and an allegation of disparate pay is, in general, sufficient to state an adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002); *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1030-31 (7th Cir. 2003). The Bank, however, denies that these employees were similarly situated to Matthews.

### e.    Termination of employment

Finally, Matthews contends that the Bank discriminated against her by terminating her employment on the basis of her race. The Bank admits that this allegation, if true, would amount to an adverse employment action. *Traylor*, 295 F.3d at 788-89. The Bank disputes, however, that Matthews was meeting the Bank's legitimate expectations.

### 2. Was Matthews qualified for the job or meeting the Bank's legitimate expectations?

The Bank further disputes Matthews' claims of discriminatory denial of training and termination on the grounds that she does not meet this next prong of the *prima facie* case. First, Matthews basically admits that she was not qualified for the job in the computer room; that is why she would have needed training for the position. Sokol, on the other hand, the employee chosen for the computer room position, was more knowledgeable in computers than Matthews.[6] Matthews did not claim that Sokol needed training on the computers.

Second, the Bank contends that, contrary to Matthews' discrimination claims, it terminated Matthews' employment for insubordination. In order to establish a *prima facie* case of wrongful termination based on racial discrimination, Matthews must show that she was performing her job satisfactorily enough to avoid discharge absent racial bias. *Cowan v. Glenbrook Security Srvs., Inc.*, 123 F.3d 438, 445 (7th Cir. 1997). Matthews admits to the conduct for which the Bank claims she was terminated. Matthews' awareness for her below-average performance began on February 20, 1997, when she received a written Unplanned Absence Disciplinary Action Notice and was placed on counseling status for ninety days. In that same month, Matthews was rated by supervisor Lily Chin as "did not meet expectations" because she only produced thirteen cases per day, rather than the twenty or more required for a rating of "met expectations" or above. On March 18, 1997, Matthews was counseled by supervisor Cassandra Ramsey regarding additional unplanned absences, and she was issued another written Unplanned Absence Disciplinary Action Notice and placed on warning status for ninety days. In March, Matthews received another performance review from Chin

---

[6]Matthews merely insists, without support, that Sokol was previously exposed to more computer work "due to her race."

27

with an overall rating of "did not meet expectations." On April 3, 1997, Matthews received a formal notice for not meeting her department's expectations on productivity, and she was placed on warning status for three months. In June 1997, Matthews again received an overall rating of "did not meet expectations" on a performance review from supervisor Sylvia Prickel. That month, the Check Adjustment Department implemented new performance measures based on efficiency standards whereby employees were required to maintain a 60% efficiency rating. As of November 1997, Matthews' performance efficiency rating was 32%.

Finally, on November 17, 1997, Kathy Williams and Kathy Balice, supervisors in the Check Adjustment Department, and Cassandra Ramsey, Matthews' direct supervisor, met with Matthews to discuss her performance. They presented Matthews with a probationary memorandum and stated that if Matthews did not read and sign the memo and discuss her performance, then she would be terminated. Matthews raised her voice at the other women, refused to read or sign the memo, and walked out of the meeting – Matthews claims, to go to a previously scheduled appointment. The supervisors claim that Matthews yelled and screamed and totally lost control, which they considered to be insubordinate. Matthews was then terminated effective immediately.

"It is not [the Court's] province to second-guess the business judgment of an employer where, as here, it acted on ample legitimate justification for [terminating] the plaintiff." *Cowan*, 123 F.3d at 445-46 (quoting *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989)). In *Cowan*, the Seventh Circuit held that even when viewing the facts in the light most favorable to the plaintiff, the plaintiff did not meet his employer's legitimate expectations because his habitual tardiness and flagrant disregard of his supervisor's repeated warnings in the months prior to his dismissal were clearly the cause of his termination as alleged by the employer. *Cowan*, 123 F.3d

at 444-46. In addition, in *Firestone*, the Seventh Circuit held that the plaintiff could not expect to maintain his supervisory position in light of his sharply deteriorating performance. *Firestone*, 875 F.2d at 1330. As in *Cowan* and *Firestone*, the combination of Matthews' excessive absences, her below average performance, and her outburst at her supervisors after being warned against each of these problems provided ample non-discriminatory justification for the Bank to terminate Matthews, and the Court will not second-guess the Bank's business judgment.

### 3. Did the Bank treat similarly situated employees outside of the protected class more favorably?

With regard to her disparate pay claim, Matthews alleges that certain Caucasian bank employees – Mihalic, Freer, and Ripoli – earned more than she did in the 1990's solely because of their race. Matthews, however, has not shown that these employees were similarly situated to her. As stated above, in comparing a discrimination plaintiff's treatment to other employees, "the plaintiff must show that the 'comparables' are similarly situated in all respects." *Spath*, 211 F.3d at 397. This includes job title, grade, performance, qualifications, experience and/or seniority. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). Matthews has not shown that she was similarly situated to Mihalic and Freer in any of these respects. First, Matthews has not provided evidence of Mihalic's and Freer's salaries. Second, Matthews admits that Mihalic and Freer were not similarly situated to her, because she admits that during the time frame from which her pay claims arise, Mihalic and Freer had higher job grades with higher salary ranges than her. Mihalic was three grades ahead of Matthews by the time Matthews even began working at the Bank in 1969. The fact that Matthews assisted Mihalic with some part of her job does not mean that Matthews was as qualified or experienced as Mihalic and deserved to receive the same pay as her.

Matthews also has not shown that she was similarly situated to Ripoli. In 1982, the two employees had the same grade and received the same salary, but by 1985, Ripoli was earning $1,500 per year more than Matthews, and their pay disparity continued through the 1990's. Thus, during the relevant time periods, Ripoli and Matthews were not similarly situated. In addition, Matthews fails to present evidence as to Ripoli's work performance, qualifications, or seniority. *Radue*, 219 F.3d at 617-18. As such, she has not shown that Ripoli's "comparables" were similarly situated to her own. *Spath*, 211 F.3d at 397.

In addition, with regard to her failure to promote claims, Matthews admitted that the employee who was chosen to move to the computer room, Josephine Sokol, was not similarly situated to her, as Sokol was more knowledgeable and experienced in computers than Matthews. Matthews also admits that she does not know why the previous African-American employee was removed from the computer room, or what job duties Sokol performed in the computer room. Therefore, Matthews has not presented sufficient evidence that similarly situated white employees were treated better than she was.

### C.    Alice Dixon

#### 1.    Did Dixon suffer an adverse employment action?

Dixon claims that the Bank discriminated against her by denying several of her applications for promotion, demoting her, and paying her less than other employees between 1992 and 2000. The Court need only address those claims that came after February 1996, the earliest that a § 1981 claim may stand in this case. In October 1996, Dixon applied for a Customer Service Consultant ("CSC") position, which ranges from grades nine to eleven, but Dixon was not selected for any of the open positions. In November 1996, Dixon was promoted to processor A, grade six. On January 6, 1997;

April 10, 1997; and January 9, 1998; Dixon applied for a CSC position for a second, third, and fourth time, but she was not selected. Dixon also applied for several other positions for which she was not selected: (1) examiner trainee, October 1997; (2) assistant control specialist, December 1997; (3) analyst in Check Administration department, January 1999; and (4) Special Operations Consulting Team, May 1999. Dixon retired in July 2000, as a Processor A, grade six, in the Check Department. The Bank agrees that on its face, a failure to promote constitutes a material adverse employment action, but the Bank claims that Dixon was not similarly situated to the employees who were given the promotions. *See Volovsek*, 344 F.3d at 688 (the failure to promote is, in general, considered an adverse employment action). Dixon also makes a half-hearted disparate pay claim, alleging that her supervisors, Sandra Gad and Kathy Balice, were less qualified than she was, but earned more money. The Bank disputes this issue on the grounds that Gad and Balice were not similarly situated to Dixon.

Dixon also claims that the Bank discriminated against her on the basis of race by demoting her. Dixon argues that the Bank demoted her in September 1997 when some of her credit information responsibilities were transferred to the Customer Service Department. Prior to September 1997, one of Dixon's responsibilities as a processor grade A was to provide certain credit information to financial institutions. In September 1997, Manager Marsha Coleman advised Dixon that those responsibilities would be reassigned to the Customer Service Department. The reassignment also affected two other employees with whom Dixon worked -- Judy Brown (African-American) and Marion Caccioppo (white). Dixon's job grade and salary were not affected by the reassignment of her credit information responsibilities, but Dixon claims -- without supporting

evidence – that the reassignment took away one-quarter of her responsibilities. Shortly after the reassignment, Dixon, Brown, and Caccioppo acquired certain additional debit-side duties.

The Bank's transfer of some of Dixon's responsibilities, however, did not constitute a demotion. The reallocation of responsibilities did not have a material adverse impact on her job, and similarly-situated white employees were not treated more favorably. As explained in the Court's discussion of Daniels, a demotion constitutes a materially adverse employment action when it results in "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that maybe unique to a particular situation." *Crady*, 993 F.2d at 136. *See also Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). As with Daniels, neither Dixon's job grade nor salary were affected by the reassignment of the credit information responsibilities. In fact, the Bank also reassigned responsibilities away from two other employees with whom Dixon worked, one of whom is white. Moreover, shortly after the reassignment, Dixon acquired new debit-side responsibilities which helped fill the gap left by the transferred credit information responsibilities. Therefore, Dixon has not presented evidence showing that her material responsibilities were significantly diminished or that similarly situated white employees were treated more favorably than she was.

2. **Was Dixon qualified for the job or meeting the Bank's legitimate expectations?**

Dixon did not meet the Bank's qualifications for the promotions she sought. Dixon believes her non-selection was discriminatory because she thought her prior customer service experience qualified her for the open positions. However, the hiring manager for CSC positions, William Gehant, told Dixon that she was not selected for the CSC positions to which she applied because

those positions were more than two grades above her current position, and therefore, she was ineligible under the Bank's promotion policy. In addition, on April 10, 1997, someone wrote "does not meet minimum requirements" on her application. The CSC positions ranged from grades nine through eleven, but Dixon never surpassed grade six. Once, in January 1997, the Human Resources Manager, Leni Lagasholt, gave Dixon permission to apply to a CSC position since she was a recent college graduate; nevertheless, applicants with higher grade levels were chosen for the positions.[7] Regarding the other jobs for which Dixon applied, she does not provide evidence of the qualifications of the successful applicants, and she does not list the prerequisites for those jobs. Therefore, Dixon cannot prove that she was qualified for any promotions for which she applied.

Dixon argues that the Bank's claim that she was not qualified for the CSC positions because her grade was more than two levels below the grade she sought was merely a pretext for discrimination because her white supervisor, Sandra Gad, was promoted to a different position despite not meeting the Bank's requirements. The Bank's stated policy required a college degree for Gad's position, but the Bank determined that Gad had knowledge and experience equivalent to a college degree despite not having an actual degree. Dixon claims that the Bank's relaxing of qualifications for Gad but not for her was based on race. Dixon's allegation, however, fails on several levels. First, Dixon does not allege that the Bank found her grade six job equivalent to a higher grade job, as the Bank found Gad's knowledge was equivalent to its educational requirements for her position. Second, Dixon does not show that the business reasoning behind the Bank's promotion policies is the same for educational requirements as for the grade level requirements. As

---

[7]Dixon was told by CSC Gwyn Smith that the most successful candidates were higher-grade supervisors who were losing their jobs because the Bank was phasing out their positions.

this Court has already stated, "[i]t is not [the Court's] province to second-guess the business judgment of an employer where, as here, it acted on ample legitimate justification . . ." *Cowan*, 123 F.3d at 445-46. Moreover, Dixon does not discuss Gad's work performance and qualifications outside of her education, which may be better than Dixon's and which the Bank may have also valued in making its promotion decisions.

### 3. Did the Bank treat similarly situated employees outside of the protected class more favorably?

Dixon also has not shown that the Bank treated similarly situated employees outside of the protected class more favorably. First, with regard to Dixon's demotion claim, a white employee had the same responsibilities transferred as Dixon. Second, with regard to her failure to promote claims, Dixon either was not similarly situated to the employees who ultimately got the positions for which she applied, or she does not provide evidence of the qualifications of the employees who got the positions. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-[African-American] employees, the plaintiff must show that the 'comparables' are similarly situated in *all respects*." *Spath*, 211 F.3d at 397 (emphasis in original); *Radue*, 219 F.3d at 617-18. *See also Hoffman-Dombrowski v. Arlington Intern. Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A failure to offer such "comparables" dooms a plaintiff's Title VII claims and obviates the need to address her particularized allegations of disparate treatment. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002).

For the positions she applied for in January 1997, October 1997, December 1997, and January 1998, however, Dixon does not know how many people applied for the open positions, the

racial composition of the applicant pool, who ultimately received the open positions, what their educational background or work experience was, or anything else about their qualifications. Therefore, she cannot even begin to make the necessary comparisons. Similarly, although Dixon was able to identify at least some of the successful candidates for promotions she sought in October 1996 (four whites, three African-Americans and one Hispanic with a higher job grade than Dixon), April 1997 (a white employee with a higher job grade than Dixon), January 1999 (a Hispanic male), and May 1999, she admits that she knows nothing about the applicant pool or the successful applicants' educational backgrounds, qualifications or work performance.

Dixon claims that she does not need this evidence to show that she is more qualified than the applicants because the Bank requested she train the successful applicants for those positions. While the Bank denies that Dixon did more than merely field occasional questions from these individuals, even if the Bank did request that Dixon train the successful applicants, that does not show that Dixon was as or more qualified for the positions. Dixon does not state what she allegedly trained the applicants to do, or whether it was a small or large part of their job. Attorneys are trained every day how to use computers, how to use the copy machines in the office, and even how to use their phones. Their trainers, however, cannot claim to be capable of performing the attorneys' job.

Dixon also blames her failure to be promoted on her Caucasian supervisor, Sandra Gad. Dixon claims Gad discriminated against her based on her race because she provided greater career assistance to white employees with less education than Dixon, such as Kathy Balice, who also became Dixon's supervisor. Dixon claims that Gad did not support her in her quest for promotions and told her she is responsible for developing her own career plan. The Bank, however, denies that Gad provided greater career assistance to Balice, and Dixon does not provide supporting evidence

for this allegation. Moreover, Dixon does not allege anything improper about Gad's encouraging her to develop her own career plan – there is no evidence that Gad developed Balice's or any other employee's career plan.

Dixon also attempts to claim that the Bank discriminated against her because her white supervisors, Gad and Balice, earned a higher salary and higher grade than her while Dixon claims she was a more qualified employee than them. Dixon claims that she became more qualified than Gad and Balice when she received a college degree in 1996, since these two women did not have college degrees. As explained above, in 1986, Gad became a grade fifty-seven supervisor even though the position required a college degree. Gad continued to be promoted and according to Dixon, by 1996, she earned approximately $14,000 more than Dixon. Balice also was eventually promoted to a supervisory role and earned over $7,000 more than Dixon by 1996.

Dixon's college degree, however, does not make her more qualified than Gad and Balice. It may make Dixon more educated than her supervisors, but as Dixon admits, Gad and Balice were not similarly situated to her as they were her supervisors, and they appropriately earned more money than she did. Moreover, Dixon does not discuss any employee attributes besides education where Gad and Balice may have surpassed Dixon, such as work performance or experience. "In determining whether two or more individuals are similarly situated, we have centered our analysis on characteristics such as education, experience, performance, qualifications, and conduct." *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003). *See also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus,*, 328 F.3d 309, 319 (7th Cir. 2003). Furthermore, "[d]ifferent employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination for

the simple reason that different supervisors may exercise their discretion differently." *Radue*, 219 F.3d at 618. Dixon does not suggest that the same supervisors decided her employment fate as decided that of her supervisors Gad and Balice (in fact, she alleges that Gad and Balice decided her fate), and Dixon provides no evidence that the Bank ever promoted someone multiple levels to a supervisory position just because they earned a college degree.

After her other arguments come up short, Dixon argues that the Bank had a "pattern and practice" of discrimination. As explained above, however, this is not sufficient to show a *prima facie* case of discrimination, *Gilty*, 919 F.2d at 1252, and even if it was sufficient, the purported statistical evidence Dixon presents does not help Dixon's individual claims.[8]

> In order to be considered, the statistics must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and the other similarly situated employees must have shared a common supervisor; and treatment of the other employees must have occurred during the same [time frame] as when the plaintiff was discharged.

*Balderston*, 328 F.3d at 320. In *Kadas v. MCI Systemhouse Corp.*, the Seventh Circuit declined to set out a *per se* rule that statistical evidence alone could never establish a *prima facie* case of intentional discrimination. 255 F.3d 359, 363 (7th Cir. 2001). However, the Seventh Circuit explained that such a case where statistical evidence might ever suffice would be "extreme, an unusual case," and "it is unlikely that a pure correlation . . . would be enough to establish a *prima facie* case of intentional discrimination." *Id.*

---

[8]The Bank also argues that the statistical evidence was unauthenticated and thus should be stricken. The Court need not reach this argument as Dixon's statistical evidence is insufficient to prove a *prima facie* case of discrimination.

But, as the Seventh Circuit found in *Kadas*, the existence of an unusual case exception "cannot help the plaintiff in this case, the facts of which are wildly different." *Id. See also Kidd v. Illinois State Police*, 167 F.3d 1084, 1101 (7th Cir. 1999). While Dixon claims discrimination caused her not to be promoted past the grade six level, her statistics show that in 1996, 45.1% of employees in grades eight to nine and 25.1% of employees in grades ten to eleven were African-American. Furthermore, although the number of African-American employees dropped off in grades twelve to sixteen, African-Americans were promoted in greater percentages than their representation in those grade levels. While African-American employees made up 15.2% to 5.9% of those grade levels, 16% of the promotions were of African-American employees. In addition, while only 25% of employees in grades ten to eleven were African-American, 20% of the promotions were African-Americans. These numbers do not establish or even support a *prima facie* case.

## D. Gerard Brice

### 1. Did Brice suffer an adverse employment action?

Brice alleges that the Bank discriminated against him based on race by failing to grant him various promotions and through wage discrimination.

#### a. Failure to promote

As explained above, a failure to promote where the plaintiff was actually rejected for a position is considered an adverse employment action. *Volovsek*, 344 F.3d at 688; *Grayson*, 317 F.3d at 748. The Bank does not dispute that it did not promote Brice to the positions hereafter described. First, Brice claims that in January or February of 1996, during the restructuring in the Accounting Department, the Bank failed to promote him to the supervisor position ultimately awarded to a Caucasian employee, Michael Van Nest. Next, Brice claims that at some point between February

38

and July of 1996, the Bank failed to promote him to the newly created position of supervisor of the Interdistrict Accounting Group in the Accounting Department, which was filled by another Caucasian employee, Chris Barfels. Neither of these supervisor positions were posted; therefore, Brice could not apply for them. According to Brice's deposition testimony, he expressed interest in the position filled by Van Nest when he told department manager Mark Taylor that he "definitely wanted to be one of the candidates" for a new supervisor position that might result from the restructuring of the Accounting Department. In addition, before Barfels received his promotion, Brice claims that he had discussions with Taylor about moving up within the Interdistrict Accounting Department. However, Brice does not allege that Taylor agreed to consider him for the position or that Taylor had the authority to promote him or recommend him for promotion. Thus, Brice has not shown that he suffered an adverse employment action with respect to the two supervisory positions.

Lastly, Brice claims the Bank denied him an auditor position based on his race. In September 1997, Brice applied for and was interviewed for one of four posted auditor positions available in the Audit Department. Brice, however, was not selected for the position. Four Caucasians individuals who had recently graduated from college were placed in the auditor positions. Because Brice has established that he applied for and was denied the auditor position, he has shown that he suffered an adverse employment action.

### b.    Wage discrimination

Brice also alleges that he is underpaid in comparison to white employees, specifically Van Nest and Barfels. In general, a claim of disparate pay is sufficient to show an adverse employment action. In the wage discrimination context, a *prima facie* case requires the plaintiff to show that he was paid less than a similarly situated person outside of the protected class. *See Johnson v. Univ.*

*of Wisconsin-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995). In this case, Brice cannot show that he was similarly situated to Van Nest or Barfels, as will be shown below.

### 2. Was Brice qualified for the job or meeting the Bank's legitimate expectations?

Even if Brice had established that he was considered for and rejected from the supervisory positions, Brice has not proven that he was qualified for those positions. Brice admits that he does not know what all of the criteria were for selecting the individual to fill the supervisor positions. Nevertheless, Brice testifies that he was qualified for the positions. In 1997, a year after Van Nest had been promoted to one of the supervisor positions, Van Nest testified in deposition that Brice was qualified to be a supervisor. Van Nest's testimony, without evidence that Van Nest had any voice in the promotion decision and without evidence of the selection criteria for the position, does not establish that Brice was qualified for the supervisor position at the time Van Nest received the position or even at the time of Van Nest's testimony. Brice also cannot show he was qualified for the position filled by Barfels because he only has his own self-serving testimony to support that claim. *Dunn*, 260 F.3d at 787. Without evidence of the position's selection criteria, Brice cannot establish that he was qualified for the position. *See Bennett*, 295 F.3d at 696.

Brice also cannot show that he was qualified for the auditor position for which he interviewed in September 1997. First, Brice's evidence on this issue consists almost entirely of inadmissible hearsay. Second, even if the testimony could be admitted under an exception to the hearsay rule, Brice still does not show that he was qualified for this position. Brice claims that manager Patricia Caldwell told him that the Audit Department was looking for "people with bank knowledge." Brice argues that he met this generic selection criteria, and that his rejection was discriminatory. Brice's

one-sided evaluation of his qualifications, however, is insufficient to create a genuine issue of fact. *Rabinovitz*, 87 F.3d at 487.

Furthermore, after he was rejected, Adriane McCoy of the Audit Department allegedly told Brice that the decision had been made to pull back the original posting for the auditor positions and make them entry level positions such that Brice would no longer be suited for them. McCoy stated that the successful candidates were all "fresh out of college," and Brice does not know what grade levels were given to the individuals ultimately selected for auditor positions. Michelle Brown in Human Resources, however, allegedly told Brice that he was qualified for the position, and she attempted to find out why he did not receive the position by contacting the hiring manager, Bob Casey. According to Brice's double hearsay testimony, Casey told Brown that Brice "didn't fit in," without further explanation. Brown's isolated statement about Brice's qualifications for the auditor position, without more, is insufficient to create a genuine issue of material fact. Because Brice is unable to prove that he was qualified for the auditor position, he cannot meet this prong of the *prima facie* case of discrimination.

### 3. Did the Bank treat similarly situated employees outside of the protected class more favorably?

Brice also cannot meet this prong of the *prima facie* case for his failure to promote and wage discrimination claims because he cannot prove that he was similarly situated to Van Nest or Barfels, and Brice does not know the qualifications of the successful candidates for the auditor position. As explained above, the plaintiff must show that the employees' "comparables" are similarly situated in all respects, including job title, grade, performance, qualifications, experience, and seniority. *Spath*, 211 F.3d at 397; *Radue*, 219 F.3d at 617-18. "[P]ersons who do not have the same or

equivalent positions are not similarly situated with respect to a potential promotion." *Grayson*, 317

F.3d at 749. Brice admits that he and Van Nest did not hold similar positions prior to Van Nest

receiving the promotion; Van Nest was an Accountant C (grade level unknown), and Brice worked

at a lower level as a grade seven Processor. In addition, Van Nest had superior work experience to

Brice. Prior to the Reserve Bank, Van Nest had six years full-time and four years part-time work

experience performing accounting functions with various supervisory experience. By contrast, prior

to the Bank, Brice had worked part-time for four years as a budget analyst, with no supervisory

responsibilities. Therefore, Brice has not established that Van Nest was similarly situated to him.

In addition, Brice does not show that he and Barfels were similarly situated. First, Brice has

produced no evidence that he and Barfels held the same or equivalent positions before Barfels

became supervisor. Brice claims that his qualifications are shown because after Barfels joined the

Interdistrict Accounting group, Brice spent three months training Barfels in his duties before he

became supervisor. Brice, however, does not state in what or how much he trained Barfels. In

addition, Brice admits that he knows nothing about Barfels' educational background, qualifications,

work experience, job grade, or work performance. Because Brice lacks this information, he cannot

establish that he and Barfels were similarly situated prior to the time Barfels became a supervisor.

Finally, Brice also cannot show that he and the successful candidates for the auditor positions

were similarly situated. Brice admitted that he knew the successful candidates were "fresh out

college," but when the auditor positions were filled in September 1997, Brice had been with the

Bank for over a year and out of college for four years. Furthermore, Brice testified that he knows

nothing of the successful candidates' employment history or qualifications. For one of the successful

candidates, Brice points to an exhibit entitled "Data for Brian Cahoon," which has no identifying

Bates Number or other authenticating information. Even if the Court were to rely on this inadmissible document, it only shows that Cahoon worked as an intern at the Bank and had earned a Bachelor's Degree prior to working in the Audit Department. This information is insufficient to show that Brice had comparable work experience, and was thus similarly situated, to Cahoon or any of the other candidates who received the auditor positions. For these reasons, Brice is unable to establish this prong of a *prima facie* case of discrimination.

### E. Charles Carson

#### 1. Did Carson suffer an adverse employment action?

Carson alleges that on two occasions the Bank decided not to promote him based upon racial animus. Carson also asserts that he was discharged due to discrimination based on race, disability, and retaliation for filing this lawsuit. Carson, however, did not amend his complaint to include allegations of disability discrimination and retaliation, so the Court will not address these issues.

##### a. Failure to promote

Carson claims that the Bank failed to promote him on two occasions based upon his race. In the Seventh Circuit, in order to demonstrate that a failure to promote was an adverse employment action, the plaintiff must show that he was rejected for the position which he sought. *Gorence*, 242 F.3d at 765; *Johnson*, 260 F.3d at 732. Carson's first claim surrounds his promotion from grade ten to grade eleven on August 25, 1997. Carson argues that he should have been promoted earlier. Carson compares himself to Sue Seeger, a Caucasian woman, who was promoted to grade eleven in April or May 1997. Carson, however, did not apply for or request this promotion prior to Seeger's promotion. Instead, after Seeger's promotion, Carson requested a promotion from Vice President Tom Mossimoto. A month or two after his request, Carson received his promotion.

43

Carson's claim of failure to promote fails because he was not rejected for the position which he sought. Instead, Carson demonstrates that he requested a promotion and received the promotion within two months. Moreover, a mere two-month pay differential is not sufficient to constitute an adverse employment action. "[C]ommon sense and the examples used in the statute's principal section, 42 U.S.C. §2000e-2(a), exclude instances of different treatment that have little or no effect on an employee's job." *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). The small amount of money at issue in this case hardly amounts to a "significant change in employment status." *Gulley v. Am. Trans Air, Inc.*, No. 02 C 3616, 2003 WL 22159470, at *5 (N.D. Ill. Sept. 18, 2003).

Carson also claims that the Bank failed to promote him to the Server Group when he applied for a position with the group in 2000. Carson did not receive the position in the Server Group, and the position was given to Debbie Deema, a Caucasian woman. As Carson's application was rejected, he has sufficiently shown that he suffered an adverse employment action.

### b. Wrongful termination

In addition, Carson alleges that he experienced an adverse employment action when the Bank terminated his employment on November 19, 2002. According to the Seventh Circuit, a materially adverse employment action might include a termination of employment. *Crady*, 993 F.2d at 136. Carson has thus sufficiently alleged an adverse employment action here.

### 2. Was Carson qualified for the job or meeting the Bank's legitimate expectations?

### a. Failure to promote

The Court will address only the surviving failure to promote claim, that of Carson's rejected application to the Server Group. The Seventh Circuit requires that in a failure to promote claim, the

plaintiff establish that he or she was qualified for the position sought. *Gorence*, 242 F.3d at 765; *Johnson*, 260 F.3d at 732. The Bank argues that Carson has not shown evidence of the necessary qualifications for the position with the Server Group, and thus that Carson cannot demonstrate that he was qualified for the position. The evidence on record indicates that the position with the Server Group was classified as a grade fourteen or fifteen. At the time Carson applied for the position, he was working at a grade twelve position. Carson was told by Cindy McCullogh, an employee from Human Resources, that he did not have enough experience for the higher level position. Carson argues that he had the requisite experience and qualifications, but his only evidence is his testimony that he attended classes to earn a certification in Microsoft Windows NT.

Even if Carson had somehow shown that this certification was a criterion for a position with the Server Group – which he did not – Carson does not show that it was a sufficient criterion for the position because he does not allege what the qualifications for the Server Group positions were. In addition, Carson's own, unsubstantiated testimony that he was qualified is not enough to establish a genuine issue of material fact. *Dunn*, 260 F. 3d at 787. An employee's opinion of his own work performance does not tell a reasonable fact-finder anything about the employer's perception of the employee's abilities. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Without evidence of the qualifications for the Server Group position, Carson's self-evaluation cannot establish that his technical course work and related experience qualified him for a position with the Server Group. Therefore, Carson has failed to prove a *prima facie* claim of discrimination based on a failure to promote him to the Server Group.

### b.     Wrongful termination

Carson claims that the Bank terminated his employment on November 19, 2002, because of his race.  The Bank, however, argues that Carson was terminated for violation of the Bank's Code of Conduct by failing to respond to the Bank's requests for the repayment of thousands of dollars of alleged personal calls billed to Carson's Bank-issued cellular phone.  As explained above, in order for Carson to establish a *prima facie* case of wrongful termination based on racial discrimination, he must demonstrate that he was "performing his job satisfactorily enough to avoid discharge absent racial bias." *Cowan*, 123 F.3d at 445.  In *Cowan*, the Seventh Circuit found that the plaintiff security guard did not establish that he was performing his job sufficiently to avoid discharge without racial animus, as his employer had documented several warnings to the plaintiff about his tardiness. *Id.* at 442, 445.

Similar to the repeated warnings in *Cowan*, the Bank tendered several warnings to Carson, culminating in a final warning that Carson could be terminated if he failed to resolve the outstanding bill payment.  Carson had requested a cellular phone from the Bank in August 2001, and he had agreed in writing to use the phone for Bank business and to limit personal calls to emergencies.  In the months of March, April, and May 2002, however, Carson incurred cellular phone bills of $3,174; $1,830; and $2,115; respectively.  Carson admits that he made at least $6000 worth of personal phone calls on his Bank-issued cellular phone.  As a result of the excessive phone calls, the Bank suspended Carson for three weeks in July 2002.  On September 5, 2002, the Bank sent a memorandum to Carson demanding that Carson make arrangements to repay the phone charges by October 15, 2002.  Carson failed to respond to the Bank by this deadline, and the Bank sent another memorandum requesting repayment and extending the deadline to October 28, 2002.  Carson replied

that his attorney, Ernest Powell, would resolve the matter with the Bank. In response to a request by Powell for more information about the repayment, the Bank sent Powell a letter indicating that: (1) the phone bills constituted a serious violation of the Bank's Code of Conduct; (2) as such, an employee could be immediately dismissed from employment; and (3) the Bank required a satisfactory resolution by November 15, 2002. On November 19, 2002, after Carson again missed the deadline to make arrangements for repayment, the Bank terminated Carson for violation of the Bank's Code of Conduct for failing to respond to the Bank's requests for the phone bill repayment. Thus, as in *Cowan*, Carson did not establish that he was performing his job sufficiently to avoid discharge absent racial bias, and so he has failed to establish a *prima facie* case of wrongful termination.

### 3. Did the Bank treat similarly situated employees outside of the protected class more favorably?

Carson has also failed to demonstrate this prong of the *prima facie* case because: (1) he did not show that the employee who ultimately received the promotion for which he was rejected was similarly situated to him in all respects; and (2) he did not allege that any non-African-American employees were not or would not be terminated for violating the Bank's Code of Conduct as he did.

### D. Legitimate non-discriminatory reasons and pretext

Under the *McDonnell Douglas* test, if the plaintiff establishes a *prima facie* case of discrimination, the employer is required to articulate a legitimate, non-discriminatory reason for its employment action, and if the employer satisfies its burden of production, the burden returns to the employee to show that the employer's proffered reason is pretextual, that is, that race more likely motivated the employer. *Johnson*, 260 F.3d at 731-32. The Court need not reach the issue of pretext

47

because Plaintiffs have failed to make out a *prima facie* case of discrimination. However, even if Plaintiffs had stated a *prima facie* case, the Bank has set forth legitimate, non-discriminatory reasons for its actions that Plaintiffs are unable to rebut.

The Seventh Circuit holds that the employer need only supply an honest, non-discriminatory reason for its employment decision, not necessarily a reasonable one, because "it is not [the Court's] province to second-guess the business judgment of an employer where, as here, it acted on ample legitimate justification." *Cowan*, 123 F.3d at 445-46. *See also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677, 680 (7th Cir. 1997). In *Olsen v. Marshall & Ilsley Corp*, the court upheld summary judgment for the defendant bank when the plaintiff did not offer evidence rebutting that the bank honestly remained dissatisfied with his work performance and there was a factual basis for the bank's belief that the employee's performance did not meet its standards. 267 F.3d at 602-03. Plaintiffs have not offered evidence questioning the honesty of the reasons behind the Bank's decisions, and the Bank has presented a factual basis for its beliefs that certain Plaintiffs did not meet performance expectations or the qualifications for the jobs that they sought. The *Olsen* court would not compare the bank's decision to potential treatment by average employers, and neither will this Court. Thus, Plaintiffs have not proven that the Bank's non-discriminatory reasons for its actions were a pretext to discrimination.

## VII.    Motions To Strike

The Bank has also filed motions to strike several of Plaintiffs' Rule 56.1 responses and statements of additional facts on the grounds that certain Plaintiffs inappropriately: (1) attached exhibits that were unauthenticated or inadmissible hearsay; (2) included narrative statements after their admissions; (3) failed to include specific references to affidavits or parts of the record; and (4)

stated that certain facts were "denied," when, in fact, they admitted them. *See* Northern District of Illinois Local Rule 56.1; Fed. R. Evid. 801(c); Fed. R. Evid. 901(b); *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 527-28 (7th Cir. 2000); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995); *Friedel*, 832 F.2d at 970; *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985). These motions are moot because the Court has found that Plaintiffs each failed to present a *prima facie* case of discrimination even in light of the responses and statements of additional fact that failed to conform to Local Rule 56.1. As such, the Court would grant the Bank's summary judgment motions regardless of the motions to strike.

## VIII. Conclusion

Due to the foregoing analysis, this Court finds no genuine issues of material fact have been raised by Daniels, Matthews, Dixon, Brice, or Carson, and the Court GRANTS summary judgment in favor of the Reserve Bank with respect to each of these Plaintiffs.

IT IS SO ORDERED.

_3/3/04_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler