IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS DANIELS, et al.,                    )
                                           )
            Plaintiffs,                    )
                                           )     No. 98 C 1186
v.                                         )
                                           )     Judge William J. Hibbler
FEDERAL RESERVE BANK OF                    )
CHICAGO                                    )
                                           )
            Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Defendant, Federal Reserve Bank of Chicago ("Bank"), seeks summary judgment on the

Amended Class Action Complaint ("Complaint") against certain plaintiffs, Marsha Daniels, Janice

Harrison, Phyllis King, Adriene McCoy, and Arnold Pugh (collectively, "Plaintiffs"). On February

25, 1998, eight current and former African-American employees of the Bank, including King, filed

a complaint alleging that the Bank discriminated against them on the basis of their race. On June

18, 1998, the complaint was amended to add plaintiffs Daniels, McCoy, Harrison, and Pugh. Count

I comprises Plaintiffs' only surviving claim against the Bank.[1] The Court decertified the class on

May 2, 2002, and returned the case to the status of individual claims.

Count I of the Complaint alleges that:

Federal Reserve intentionally subjected Plaintiffs to unequal and discriminatory

---

[1] The Plaintiffs implicated in this motion did not file charges of discrimination with the
EEOC and thus have not asserted a Title VII claim under Count IV. Counts III and VI are class
action claims that are no longer viable since the class was decertified. Counts II and V by their
terms applied only to Cedell Johnson, who is no longer a party to the case, and Counts VII and
VIII by their terms only apply to plaintiff Eleanor Baylie, who is not implicated in the Bank's
current summary judgment motions.

treatment because of their race and color by: (a) Repeatedly denying them promotions and instead selecting less qualified white employees for those positions; (b) Steering Plaintiffs to low-level, dead-end positions while steering white employees to career path positions with opportunities for advancement; (c) Falsely representing that such low-level positions have growth potential; (d) Excluding Plaintiffs from officer, management, and supervisory level positions; (e) Denying Plaintiffs increases in Grade Level to reflect their performance and responsibilities; (f) Assigning higher grade levels to white employees who have the same or similar or lower level responsibilities as Plaintiffs; (g) Denying Plaintiffs training and mentoring opportunities; (h) Subjecting Plaintiffs to a higher level of scrutiny and to stricter standards than white employees; and (i) Paying Plaintiffs less than similarly situated and less qualified white employees.

Plaintiffs claim that these alleged actions by the Bank constitute racial discrimination in employment in violation of 42 U.S.C. §1981. As the legal issues in each of Plaintiffs' cases are substantially overlapping, the Court will address each of the pending summary judgment motions in this opinion.

I.    Facts Specific To Certain Plaintiffs

    A.    Marsha Daniels

Daniels was hired by the Bank in 1968 as a general duties trainee, grade 2, and by September 1972, Daniels had been promoted to a grade 6 teletypist proof position. Later, Daniels successfully applied for the position of research statistical analyst D, grade 7, which in the early 1980s was converted to an equivalent grade 39. In December 1984, Daniels was promoted to a statistical analyst C position, grade 40, in the Research Department. Daniels acquired a college degree in 1989, and in 1992, she was promoted to a grade 41 reports analyst. The Bank changed its grading system a second time, and Daniels' position was converted to a grade 9 analyst B position, in which she remained until she retired in April 2002.[2]

---

[2]In response to the Bank's 56.1 fact statement that she voluntarily retired in 2002, Daniels states for the first time that she was constructively discharged, although she admits in her opposition brief that she retired and she provides no supporting evidence. This claim cannot stand.

**B.  Janice Harrison**

Harrison was hired by the Bank in 1972 at grade 4, and by 1977, she had been promoted a third time to training assistant, grade 8, which was converted to an equivalent grade 40 in 1982. In 1984, Harrison was voluntarily transferred to the Customer Service Department as a Research Assistant C, and in 1988, Harrison was promoted to Research Assistant A, receiving a grade increase to 56. In 1994, Harrison's grade changed to an equivalent grade 8, which was soon increased to a grade 9. She retired as an analyst, grade 9, in the Retail Sales Department in June 2000.

**C.  Phyllis King**

The Bank hired King as a General Duties Trainee A, grade 3, in 1974, and by the end of 1977, she had been promoted to Junior Auditor B, grade 8. In the next few years, she was promoted to a Junior Auditor A, grade 9, which became grade 41 in 1982, after the Bank changed its grading scheme. In 1984, King was promoted to Auditor B, grade 56, but she retired in July 1984. She returned to the Bank in 1986 and soon regained her old position. In 1988 King was promoted twice: to Auditor A, grade 57, and then to grade 58. In 1990, the Bank granted King's request to work part-time. In 1993, King's grade changed to 12, and her position changed to Audit Supervisor when the Bank's grading system changed again. In 1997, King returned to full-time work, and in 2002, King was promoted to Senior Audit Supervisor, Grade 13.

**D.  Adriene McCoy**

McCoy was hired by the Bank in June 1980 as a Clerical Trainee, grade 3, and by 1987, she had been promoted four grades, to grade 40. In 1988, McCoy received her Bachelors of Science degree in Operations Management from DePaul University, and in 1989, she was promoted to Management Trainee, grade 42. In 1990, McCoy was promoted to Supervisor C, grade 57, in the

3

accounting group of the Savings Bond Department, and in 1991, she transferred to the Accounting Services Department, as a Financial Analyst C. In 1992, McCoy's title changed to Accountant A, and in 1993, the Bank's grade system changed again, and McCoy's grade changed to a 10. In April 1995, she applied for and was promoted to a grade 11 Senior Auditor in the Auditing Department, and in October 1996, McCoy was promoted to Audit Supervisor, grade 12. McCoy retired in this position in 1998.

### E. Arnold Pugh

In March 1965, the Bank hired Pugh as a mail clerk, grade 5. In October 1965, Pugh left to join the Air Force, but he was rehired by the Bank in December 1969, as a Currency Teller, grade 6. Pugh performed a variety of jobs over the next twenty years, and was promoted to Account Executive in the Bank's Business Development Department in 1989, at grade 60. After the grading system changed, Pugh's job was reclassified as a grade 10. This grade was later elevated to a grade 12, and Pugh remained in that position until his retirement in January 2003.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp.*

4

*v. Catrett*, 477 U.S. 317, 324 (1986).

Once the moving party has met its initial burden, the opposing party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Id.* The non-moving party cannot create an issue of fact with speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).

## III.     Untimely Allegations Of Discrimination

The statute of limitations for claims arising under an Act of Congress enacted after December 1, 1990, is four years. 28 U.S.C.A. § 1658(a). This limitations period applies to claims arising under the amendment to Section 1981 contained in the Civil Rights Act of 1991. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 1845-46 (2004). The parties concede that this four-year statute of limitations applies in this case. Therefore, Plaintiffs are barred from raising claims of discrimination under § 1981 for alleged adverse acts that occurred before February 25, 1994, four years before the complaint was filed. Untimely discriminatory acts may only be considered for background purposes, unless the discrimination constitutes a "continuing violation." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Daniels, Harrison, McCoy, and Pugh each describe discriminatory acts that allegedly took place prior to February 25, 1994. They claim these acts are not time-barred because they are part of a "continuing violation" by the Bank. The Seventh Circuit has discussed three different continuing violation theories:

The first theory encompasses decisions, usually relating to hiring and promotions,

5

where the employer's decision-making process takes place over a period of time, making it difficult to determine the actual date of the allegedly discriminatory act. In such instances, the statute of limitations begins running for the claim when the plaintiff knows that the decision has been made. . . . The second continuing violation theory involves an employer's express, openly espoused policy that is alleged to be discriminatory. . . . Finally, a plaintiff can show a continuing violation where an employer covertly follows a practice of discrimination over a period of time. In such a case, the plaintiff can only realize that she is a victim of discrimination after a series of discrete acts has occurred. The limitations period begins to run when the plaintiff gains such insight. However, if the plaintiff knew, or 'with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed' her, she must sue over that act within the relevant statute of limitations.

*Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir. 1994).

McCoy, Pugh, and Harrison claim that the continuing violation arose from a "Bank-wide policy" of discriminating against minorities at the Bank. They do not allege that this was an express policy, however, and the Bank's alleged discrimination does not fall into the other two categories of continuing violations either. When a plaintiff files an individual claim, rather than a class action, the plaintiff's "evidence of a pattern and practice can only be collateral to evidence of specific discrimination against the actual plaintiff." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990). The plaintiffs, however, provide no evidence of a practice of discrimination against them individually, over time.

Daniels, Harrison, and Pugh also allege that they could not reasonably have understood they were victims of discrimination until after a series of discrete acts had occurred. "With the exercise of reasonable diligence," however, the plaintiffs would have known each discrete act was discriminatory. *Merchants Nat. Bank*, 42 F.3d at 1058. In determining whether the plaintiffs should have known the alleged acts were discriminatory when they happened, the court considers: (1) whether the alleged acts against the plaintiff involved the same subject matter; (2) the frequency with

which the acts occurred; and (3) the degree of permanence of the alleged acts of discrimination that should trigger an employee's awareness and duty to assert his rights. *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Morgan*, 536 U.S. at 114. Most of Daniels' and Harrison's untimely allegations of discrimination involve discrete decisions by the Bank not to promote them, and thus constitute separate actionable employment actions under *Morgan*. In fact, Daniels admits that she believed certain untimely actions to be discriminatory at the time they occurred.[3]

The alleged untimely discriminatory acts of these plaintiffs are also too far apart to constitute a continuing violation, as two to six year gaps between alleged discriminatory acts are too wide to support a continuing violation claim. *Selan v. Kiley,* 969 F.2d 560, 567 (7th Cir. 1992); *Tinner*, 308 F.3d at 709. (1) Daniels alleges discriminatory events in 1979, then not until the mid-1980s, and then in the 1990s; (2) McCoy points to an alleged act of discrimination in 1989, and then no additional acts until 1994 and 1995; (3) Pugh claims he was discriminated against in 1969, 1972, and 1984, but then not again until 1994; and (4) Harrison alleges that she was discriminated against in the 1970's, and then again between 1989 and 1993, but then not until 1997. As in *Tinner* and *Selan*, the untimely discriminatory acts alleged by the plaintiffs were too discrete, too permanent, and too far apart in time to support the contention that the acts were continuous.

---

[3]Daniels' equitable tolling claim fails for this reason as well. *See Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Medical School*, 167 F.3d 1170, 1174 (7th Cir. 1999) ("[e]quitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.")

## IV.    Test for Discrimination

The Bank claims that summary judgment is proper against Plaintiffs because they have failed to establish a *prima facie* case of discrimination.  Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  When a plaintiff alleges intentional discrimination, as in this case, § 1981 actions have the same liability standards, and are analyzed in the same manner, as Title VII actions.  *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998).

A plaintiff alleging race discrimination must prove his or her claims using direct or indirect evidence.  "[D]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003).  Plaintiffs have not alleged direct evidence of discrimination; therefore, they must prove their claims under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), indirect burden-shifting method of proof.  Under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination.  A *prima facie* case requires a showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job or was meeting the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the employer treated similarly situated employees outside of the protected class more favorably.  *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999).  The Court need not go further because Plaintiffs fail to establish a *prima facie* case of discrimination.

## V.    Marsha Daniels

Daniels alleges that several incidents of race discrimination occurred after February 25, 1994, the relevant limitations period.  Daniels alleges that she was discriminatorily denied a promotion to:

8

(a) a Customer Service position in 1996; (b) a grade 10 position in the Research Department in 2000; (c) an Information Systems Analyst position in 1995; and (d) an Information Systems Analyst position in 1996. Daniels also claims that, on account of race, she was denied training and mentoring, steered into a dead-end job, denied access to privileged information, had different standards applied to her, and received a delayed recommendation into an MBA program.

## A. Failure to Promote

When a race discrimination plaintiff alleges a failure to promote, she must show: (1) she is a member of a protected group; (2) she was qualified for the position sought; (3) she was rejected; and (4) the employee promoted was not a member of the protected group and was not better qualified than the plaintiff. *Johnson v. Nordstrom*, 260 F.3d 727, 732 (7th Cir. 2001). Daniels first claims that she was not promoted to a Customer Service position she applied for in October and December 1996, on account of her race. Daniels admits, however, that she received a "does not meet expectations" review which made her ineligible for the customer service position. Thus, Daniels was not qualified for the position.[4] In addition, two of the five successful applicants were African American, and Daniels does not know whom the other successful applicants were.

Second, Daniels alleges that she was discriminatorily denied a promotion to a grade 10 research position in 2000. However, she fails to identify any of the job requirements for that position, and thus cannot show that she met those requirements. *Bennett v. Roberts*, 295 F.3d 687, 696 (7th Cir. 2002). In addition, Daniels cannot show other employees were treated more favorably

---

[4]Daniels believes her rating was intentionally lowered so she would not be promoted. However, Daniels does not know what performance evaluations were given to other analysts, and the Bank had legitimate, non-discriminatory reasons to give her that evaluation. Her manager claimed she required too many management interventions to complete quality edits, and, in fact, her unit required 44.81% of management interventions out of the four units.

9

as no employee was actually hired for the position. *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003). Third, Daniels claims she was discriminatorily denied promotion to an Information Systems Analyst position in 1995. Daniels, however, does not know who else applied for the job or their qualifications. Although she believes a "white guy" was chosen, possibly named Michael Cronkite, she cannot show that she was as qualified as him without knowing anything about him.

## B.    Failure to Train/Mentor

Daniels also claims that she was denied training in FlashWire, Call Text, and other Federal Reserve reports on account of her race. A discriminatory denial of job-related training can constitute an adverse employment action, so long as it results in a material adverse change in employment that is more disruptive than a mere inconvenience or alteration of job responsibilities. *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)); *Volovsek v. Wis. Dept. of Agr., Trade and Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003). If a failure to train rises to the level of an adverse employment action, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) the employer provided training to its employees; (3) she was eligible for training; and (4) she was denied training given to other similarly situated employees who were not members of the protected group. *Pafford*, 148 F.3d at 667.

Daniels argues that her failure to train or mentor claims amounts to legally adverse actions because the four employees (Helen Miello, Helen Hermans, Cathy Jo Falls, and Dale Swari) that she identifies as having received training or mentoring all were eventually promoted to senior analyst, while Daniels was never promoted that high. Daniels does not make the required showing, however, that her "comparables" were similarly situated to those employees in all respects. *Spath v. Hayes Wheels, Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). Those employees were in higher

graded positions than Daniels, and Daniels presents no evidence as to the other "comparables," including job title, grade, performance, qualifications, experience and/or seniority.[5] *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

## C.    Other Claims of Discrimination

Daniels also claims that, on account of race, she was steered into a dead-end job, denied access to privileged information, had different standards applied to her, and received a delayed recommendation into an MBA program. Most of these alleged acts do not even amount to an actionable adverse employment action. An adverse employment action is defined as:

> ... more disruptive than a mere inconvenience or an alteration of job responsibilities. A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. ... [N]ot everything that makes an employee unhappy will suffice to meet the adverse action requirement. Rather, an employee must show that material harm has resulted from the challenged actions.

*Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2002) (internal citations omitted). First, Daniels' belief that she was discriminated against because her manager, Steve Singleton, allegedly shared some information with white employees about how to process or perform work in the department does not amount to an adverse employment action under *Traylor*. Second, Angie Robinson's failure to complete an MBA recommendation form for Daniels the day after Daniels requested it was not an adverse action. Robinson completed the form in enough time for Daniels to enroll in the MBA program. Third, Daniels' voluntary transfers to other areas of the Bank do not rise to the level of material adverse actions. Daniels was not "steered into a dead-end job" when she was transferred

---

[5]In fact, Daniels received more than the required number of hours of call report training in 1999 and 2000.

11

to the research department. The jobs were the same grade, Daniels won her bid on the job, and she accepted the transfer. In addition, Daniels admits that the job would not be a dead-end job for a white employee. Daniels then agreed to transfer from Singleton's area to Jerome Julian's area.

Finally, Daniels does not show that she was held to a different standard than similarly situated white employees. Daniels claims she was discriminated against because: (1) the Bank gave her additional responsibilities when other analysts left; and (2) one performance standard in her 1996 performance review required 100% accuracy. However, Daniels does not know whether any similarly situated non-African American employees were treated any differently.

## VI.    Janice Harrison

Harrison also alleges several timely incidents of race discrimination. She alleges that: (a) she was discriminatorily denied a promotion to a customer service position in 1997; (b) her supervisor Kate McDonald discriminatorily denied her request for software training and failed to assist Harrison's efforts to advance in 1998; and (c) her next supervisor, Michelle Coussens, harassed her on account of race in November 1999.

### I.    Failure to Promote

In 1997, Harrison applied for a promotion to one of three vacant customer service positions, but she was not selected for any them. Harrison cannot make out a *prima facie* case of race discrimination, however, because she does not know what the job responsibilities for the position were, and thus she cannot show that she was qualified for the positions. "The comparisons are meaningless absent some information concerning the hiring criteria for these positions." *Bennett*, 295 F.3d at 696. In addition, Harrison does not show that other similarly situated white employees were treated differently. One successful applicant was African American, and Harrison does not

know the background of the two successful white applicants, including their job titles, grades, performance, qualifications, experience or seniority. *Radue*, 219 F.3d at 617-18. Harrison only knows the prior Bank departments the two employees had worked in. Harrison's subjective self-appraisal that she was qualified for the position cannot by itself create a genuine issue of fact. *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001).

Moreover, Harrison's reliance on "statistical evidence" is misplaced.

In order to be considered, the statistics must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and the other similarly situated employees must have shared a common supervisor; and treatment of the other employees must have occurred during the same [time frame] as when the plaintiff was discharged.

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Harrison's record of the demographics of Bank employees includes only their approximate grade levels, not any of the required specifics. Therefore, Harrison's "statistical evidence" does not help her establish a *prima facie* case of discrimination.

## B. Failure to Train

Harrison next claims that her manager, Kate McDonald, discriminatorily failed to train her in a software program called ImageSoft and excluded her from department meetings and higher level assignments that would have supported her advancement within the Bank. Harrison, however, fails to identify any employees who received the ImageSoft training, and thus Harrison cannot make the required showing that similarly situated Caucasian employees received the training. *Pafford*, 148 F.3d at 667. In addition, McDonald told Harrison that ImageSoft training was designed for people who worked in the operational side of the Check Department, of which Harrison was not a part.

13

## C.    Other Claims of Discrimination

Harrison claims she was discriminated against by being excluded from department meetings and higher level assignments. She has no evidence of this, however, and she does not identify similarly situated white employees who were treated differently. In fact, Harrison does not show that any material harm resulted from these actions, and thus she fails to state a *prima facie* case. *Traylor*, 295 F.3d at 788-89.

In addition, Harrison claims that her manager Michelle Coussens harassed her by talking down to her and telling her, "didn't I tell you not to do this?" This does not satisfy the first element of the *prima facie* case of racial harassment: that the plaintiff's work environment was both subjectively and objectively offensive. *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). A supervisor who went much farther than Coussens, treating an employee in a rude, abrupt, and arrogant manner, subjecting her to "stern and severe criticism," and failing to keep her informed about changes at work, did not to create an objectively offensive work environment in *Patton v. Indianapolis Pub. Sch. Bd.* 276 F.3d 334, 339 (7th Cir. 2002).

## VII.    Phyllis King

King alleges several timely incidents of race discrimination, including that she was discriminatorily denied: (a) two promotions; (b) assignment to certain projects; and (c) mentoring.[6]

### A.    Failure to Promote

In November 1996, King applied for, but did not receive, a Senior Audit Supervisor position. King admits that the position required a college degree, which King did not have, and therefore, King

---

[6]The Bank correctly notes that King filed her response brief almost two weeks late. As King's response fails to present an issue of fact, the Bank's request that the Court disregard the response is moot.

14

was not qualified for the position.[7] King also does not know who else applied for the position before the position was withdrawn, and thus she cannot make out a *prima facie* case.

In 1997, King applied for, but did not receive, a supervisor position in the Treasury Tax and Loan Department. King cannot make out a *prima facie* case of discrimination here because she does not know the race, job history, or performance history of the other applicants. Three months later, an Asian employee who had formerly worked in the Funds Transfer Department received that position, but King does not know his educational or performance qualifications, and thus cannot show that their "comparables are similarly situated in all respects." *Spath*, 211 F.3d at 397.

## B. Other Allegations of Discrimination

King also alleges that she was discriminated against because other employees were chosen instead of her to be: (1) mentored prior to 2000; (2) Audit Liaison to the wire and funds transfer area in 1997; (3) part of a task force for the Supervision and Regulation Department (1995 or 1996); (4) part of a task force for the Research Department (1995 or 1996); (5) Auditor-in-Charge for a special assignment in the Supervision and Regulation Department (1995 or 1996); (6) the lead in a 2000 audit. None of these actions constitute materially adverse employment actions as a matter of law because no material harm resulted from the challenged actions. *Traylor*, 295 F.3d at 788-89. In addition, King was not similarly situated to the employees chosen for these roles.[8]

---

[7]King was promoted to this position in 2002, still without a college degree. As King does not dispute that a college degree was required in 1996, the fact of her later promotion does not help her 1996 claim.

[8]Like Harrison, King briefly refers to broad, Bank-wide "statistical evidence" of discrimination in her statement of facts. Such generic statistical evidence cannot create a material issue of fact because it does not specify persons similarly situated to King. *Balderston,* 328 F.3d at 320.

King claims that Mike Seward and Allison Marturano received mentoring before her even though they were graded lower and had been at the Bank less time than King. The General Auditor, however, offered to mentor King in 2000. There is no evidence that any material harm resulted to King for not being mentored prior to 2000, and King admits that Seward and Marturano had different grades and seniority than she and thus were not similarly situated to her. In addition, King also does not allege any adverse effect on her job for the Bank's failure to assign her to certain projects, and she cannot show she was similarly situated to the employees chosen for these tasks because King does not know their work history, educational background, or other qualifications.[9] Thus, King cannot establish a *prima facie* case of discrimination.

The remaining miscellaneous actions that King claims were discriminatory also did not cause King any material harm, and King alleges no similarly situated white employees who were treated differently. She believes that her receipt of a draft performance rating of "effective" in 1997 was discriminatory, but that rating was increased to highly satisfactory after King discussed the draft rating with her manager. King also complains of a mix of compliments and criticism of her writing, but after she took a writing class at a university, her writing met expectations. Moreover, "a supervisor's assessment of an employee's skills is not an adverse employment action." *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 378 (7th Cir. 1998). Finally, the Bank's decision to have an officer instead of King make a presentation to the Central Bank of Russia does not amount to a material adverse employment action, especially in light of the fact that the Bank later reversed this decision. King knows of no one in the Audit Department who has advanced as far as she has without

___

[9]Although King does know that the Auditor-in-Charge position went to a Senior Auditor, grade 10 or 11, that employee was full-time, whereas King was only part-time. Moreover, King does not know that employee's education or work background.

a college degree, and thus these purported actions have not prevented her from gaining the knowledge and contacts necessary to advance within the Bank.

## VIII.  Adriene McCoy

McCoy also alleges that several incidents of race discrimination occurred after February 25, 1994, the relevant limitations period.  McCoy alleges that she was discriminatorily denied: (a) several promotions; (b) mentoring; and (c) certain job responsibilities.

### A.    Failure to Promote

McCoy alleges that she was discriminatorily denied a promotion eight times.  Seven of these claims fail because McCoy does not know who else applied for the positions and who ultimately received the positions.  In fact, even if McCoy's guesses as to the successful applicants are correct, she does not know their educational backgrounds or their work or performance histories, and so she cannot establish a *prima facie* case of discrimination.  *See, e.g., Spath,* 211 F.3d at 397.  The following seven claims fail: (1) Research Assistant A/B in the Government Securities division;[10] (2) Senior Auditor C in the Audit Department (March 1994); (3) Cash Department Supervisor B/A (April 1994);[11] (4) Cash Department Supervisor (September 1994);[12] (5) Senior Assistant Examiner

---

[10]Furthermore, this claim is untimely as McCoy applied for this position in 1989, and, as explained above, it does not constitute a continuing violation.

[11]McCoy's unfounded belief that a Caucasian male from another office received the position does not raise a material issue of fact.

[12]McCoy's guess that a certain Caucasian woman received the position is not sufficient to satisfy the *prima facie* case, especially in light of the fact that the woman, Linda Kariotis, was at a higher grade than McCoy and thus not similarly situated to her.

(October 1994); (6) Information Systems Analyst (February 1995);[13] and (7) Operations Manager (November 1997). Although McCoy does identify the successful applicant to the Audit Department Supervisor/Coordinator position in January 1998, McCoy's eighth promotion denial, Judy Kim was not similarly situated to McCoy because they were at different grade levels, had different positions, and worked for different managers.

McCoy also claims that the Bank's failure to promote her to a grade 12 Audit Supervisor until four to six months after a similarly situated Caucasian employee was so promoted constituted discrimination. This brief delay in promotion, however, did not cause McCoy material harm, and thus does not amount to a material adverse action. *Traylor*, 295 F.3d at 788-89. Furthermore, the two employees were in different groups and reported to different supervisors, and thus were not similarly situated.

### B. Other Allegations of Discrimination

McCoy also claims that her race is the reason why: (1) she did not receive adequate mentoring when she was in the Accounting Department prior to April 1995; (2) the goods and services acquisition process was removed from her areas of audit responsibility in late 1995 and given to a non-African American employee; and (3) she was not assigned to certain projects in 1995 and 1996. As explained above, a claim that an employee has not received adequate mentoring may constitute a materially adverse employment action; however, in this case, McCoy did receive adequate mentoring and thus there was no adverse action. Jerome Nicholas, Assistant Vice President over Cash Operations, was assigned to mentor McCoy very shortly after she requested mentoring.

---

[13]McCoy's guess that a Caucasian male who worked in financial management received the position is too speculative to support a *prima facie* case. Moreover, that employee rejected the position, and it was awarded to an African American employee.

Although Nicholas voiced his low opinion of the program, he did in fact provide McCoy with valuable mentoring, including making several suggestions on how to move up in the Bank and talking to other employees about McCoy.

Furthermore, the removal and failure to assign McCoy certain projects do not constitute material adverse employment actions under *Traylor*, 295 F.3d at 788-89, because there is no evidence that McCoy's salary, benefits, grade or title were affected. Moreover, McCoy was not similarly situated to: (1) the employee who was assigned the goods and services acquisition process in 1995; (2) the employee who was assigned to the 1995 billing conversion project; or (3) the employee who was assigned to head up an interdistrict settlement project in 1996. These employees had different managers, education, and work backgrounds.[14]

## IX. Arnold Pugh

Pugh also alleges several timely incidents of race discrimination, including a demotion, failure to promote, disparate pay, and denial of training.[15]

### A. Demotion Claim

When the Bank implemented a new grading system in 1995, Pugh claims he was discriminatorily demoted because his grade 60 Account Executive classification became a grade 10, when he believed it should have translated to a grade 14. Pugh complained to Vice President Brooks

---

[14]Like Harrison and King, McCoy briefly refers to broad, Bank-wide "statistical evidence" of discrimination in her statement of facts. Such generic statistical evidence does not create a material issue of fact because it does not refer to persons similarly situated to King, as the statistics are distinguished only by grade levels, not by jobs, experience, or education. *Balderston,* 328 F.3d at 320.

[15]Like Harrison, King, and McCoy, Pugh lists Bank-wide "statistical evidence" of discrimination that cannot create a material issue of fact. *Balderston,* 328 F.3d at 320.

about the grade, who promised to initially recommend a two-grade increase, and then an additional increase to grade 13. Six months later, Brooks raised Pugh to grade 12, where he remained for the rest of his career at the Bank. This grade reclassification does not constitute a material adverse action. To demonstrate a demotion, Pugh must show that he faced "significantly diminished material responsibilities" in his new position. *Traylor*, 295 F.3d at 788-89. Pugh, however, maintained the same responsibilities with the reclassified, and then raised, grade, and Pugh does not allege that his salary or benefits were affected. *See Crady v. Liberty Nat. Bank and Trust Co. of Indiana*, 993 F.2d 132, 135-36 (7th Cir. 1993) (affirming summary judgment against plaintiff where transfer to a new position did not involve less significant responsibilities or change in salary or benefits).

Pugh claims, however, that other Account Executives were upgraded to even higher levels, and that as a result of this "demotion," he was unable to achieve the same job success as the other employees. Even if this constitutes a material adverse action, Pugh cannot show that he was similarly situated to the white employees to whom he compares himself: Tyler Smith, James Rudny, Ron Piatek, Mike Hoppe, and Jerry Nichols. These employees reported to different supervisors in other offices, and Pugh knows nothing of their work performance or reviews. The fact that he took the same training course as Rudny does not prove that he was equally as qualified as Rudny, and Pugh's vague allegations that Nichols, Piatek, and Smith had similar educational backgrounds to himself does not make them similarly situated, as the comparables must be similarly situated in all respects. *Spath*, 211 F.3d at 397. Pugh also does not know anything about those individuals' respective job performances.

## B.    Disparate Pay Claim

Pugh next claims that he received less pay than a similarly situated white employee, Ron

Bognar. From 1993 to 1996, Ron Bognar was Manager of the Business Development department, two grades higher and at a higher salary than Pugh. In 1996, Bognar's duties were assigned to Katherine McDonald and Bognar was left performing the same Account Executive duties as Pugh. Bognar retained his title, salary, and grade, however, until March 1998, when he was officially demoted. Although an allegation of disparate pay is, in general, sufficient to state an adverse employment action, *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002), the plaintiff must show that he was paid less than a similarly situated person outside of the protected class. *See Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995). Pugh cannot show this. He admits that Bognar was differently situated, as Bognar was a higher graded and salaried manager even though he started performing the same duties as Pugh. Therefore, Pugh does not state a *prima facie* case.

## C. Failure to Promote

Pugh next claims that he should have been considered for promotion to two vacant manager positions that were not posted – one in the Wire Transfer Department, which went to Manager Ron Piatek, and one in the Customer Services Department which went to Beth Majersky. Pugh was unable to apply for these positions because they were not posted. As explained above, however, to establish a material adverse employment action in the failure to promote context, a plaintiff must show that he was rejected for the positions at issue.[16] *Grayson*, 317 F.3d at 748; *Gorence v. Eagle Food Centers*, 242 F.3d 759, 765 (7th Cir. 2001); *Johnson*, 260 F.3d at 732. Pugh believes this was

---

[16]Some cases suggest the plaintiff must show that he applied for the position from which he was rejected. *See Gaines v. White River Envtl. P'ship*, No. 02-3849, 2003 WL 1827209, at *2 (7th Cir. Mar. 27, 2003) (upholding a grant of summary judgment when the plaintiff could not establish a *prima facie* case since the employee never applied for the promotion). The Court need not reach this issue as Pugh has failed to show he was rejected for the positions.

discriminatory since he did not have a chance to apply for the manager position, but Pugh does not demonstrate that he was even considered for the positions (and then rejected) or that he was even qualified for these positions, because he does not identify the job requirements for either position. *See Bennett*, 295 F.3d at 696.

### D. Denial of Training

Pugh claims he was denied training opportunities that were given to white employees. Pugh has not alleged that any of these actions materially affected his employment, and Pugh cannot show that similarly situated non-African American employees were treated differently. Pugh alleges that John Vanderlinden and David Weir, both Account Executive in Chicago, received automation training (1994) and bank currency training (1996), respectively. However, Pugh does not know anything else about Vanderlin's or Weir's comparables, and he does not know if the third Account Executive in Chicago received the training. Similarly, although Pete Restsinis, an Account Manager in the Bank's Milwaukee office, received training on the imaging portion of check processing which Pugh did not receive, Pugh does not know anything else about Restsinis. Pugh also was not trained on the pricing of new and existing check processing in 1996, but the trainees were all graded higher than Pugh. Finally, Pugh believes an Account Executive, Mike Hoppe, was given discretion to alter the pricing and delivery of services whereas Pugh was not. Pugh, however, does not know what title and grade Hoppe had, and Hoppe reported to a different Vice President.

### E. Other Disparate Treatment Claims

Pugh's other disparate treatment claims do not constitute adverse employment actions. In 1997, the Bank implemented a series of discussions called a "Fresh Look" to provide employees with the opportunity to understand the Bank's overall direction, and Pugh had permission to participate

22

on an *ad hoc* basis. Nine months later, however, Pugh's immediate supervisor, Assistant Vice President Jeff Anderson, directed Pugh to stop working on "Fresh Look" without explanation. Pugh believes he was discriminated against on the basis of race because Bognar, who was white and recently demoted to Account Executive, continued to work on a "Fresh Look" for six months after Pugh was directed to stop. This does not constitute an adverse employment action, because the Fresh Look program did not affect Pugh's job responsibilities, title or salary, and the six month differential between Pugh and Bognar was not material. *Traylor*, 295 F.3d at 788-89.

Pugh last claims that his receipt of a performance appraisal of "did not meet expectations" for 1997 was discriminatory. Although no goals had been set for Pugh that year, Pugh was measured by the goals Bognar had created for Account Executive. After Pugh complained, Pugh's final appraisal was changed to "met expectations." Thus, Pugh did not suffer a material adverse employment action, and he cannot make out a *prima facie* case of discrimination.

## X. Conclusion

Due to the foregoing analysis, this Court finds no genuine issues of material fact have been raised by Daniels, Harrison, King, McCoy, or Pugh, and the Court GRANTS summary judgment in favor of the Reserve Bank with respect to each of these Plaintiffs.

IT IS SO ORDERED.

_2/18/05_
Dated

_Wm J. Hibbler_
The Honorable William J. Hibbler

23